UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CIVIL DIVISION AT LEXINGTON
CIVIL ACTION NO. 5:19-064-DCR

CARRIE JOHNSON, et al,

     PLAINTIFFS

VS.

BLC LEXINGTON SNF, LLC d/b/a Brookdale Richmond Place
SNF, et al,

     DEFENDANTS

_____

WITNESS:   ANN PHILLIPS

_____


     The deposition of ANN PHILLIPS was taken
via videotape on behalf of the plaintiffs before SUSAN
R. ELSENSOHN, Certified Court Reporter and Notary
Public in and for the State of Kentucky at Large, at
the offices of Quintairos, Prieto, Wood & Boyer, 2452
Sir Barton Way, Suite 300, Lexington, Kentucky, on
Thursday, December 12, 2019, commencing at the
approximate hour of 1:00 p.m.

     Said deposition was taken pursuant to
notice previously filed, for purposes of discovery and
any and all other purposes allowed under the Kentucky
Rules of Civil Procedure.

**EXHIBIT 6**

1

APPEARANCES

2

ON BEHALF OF THE PLAINTIFFS:

3

Ms. Laraclay Parker
4          Golden Law Office
771 Corporate Drive, Suite 750
5          Lexington, Kentucky  40503

6          ON BEHALF OF THE DEFENDANTS:

7          Mr. Matthew C. Cocanougher
Quintairos, Prieto, Wood & Boyer
8          2452 Sir Barton Way, Suite 300
Lexington, Kentucky  40509

9

10                    VIDEOGRAPHER:

11               Mr. Heath Elsensohn

12          *   *   *   *          *   *   *   *

13

14                       INDEX

15

16   Caption Page....................................   1

17   Appearances and Index...........................   2

18   Exhibits........................................   3

19   Examination by Ms. Parker....................4-116

20   Examination by Mr. Cocanougher.............116-127

21   Examination by Ms. Parker..................127-131

22   Reporter's Certificate......................... 132

23

24          *   *   *   *          *   *   *   *

25

2

MODERN SCRIBE - susan@modernscribe.net

1                        EXHIBITS

2

3     Exhibit No. 1................................   #

4     (Binder of documents)

5

6                *   *   *   *           *   *   *   *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      3

1            VIDEOGRAPHER:  We're on the record at

2            1:07 p.m. on December 12th of 2019.  This

3            is the video deposition of Ann Phillips

4            in the matter of Carrie Johnson, et al

5            versus BLC Lexington SNF, LLC, et al

6            filed in the United States District

7            Court, Eastern District of Kentucky,

8            Civil Action No. 5:19-064-DCR.

9               Counsel will introduce themselves for

10           the record.

11              MS. PARKER:  Lara Parker for the

12           plaintiff.

13              MR. COCANOUGHER:  Matthew Cocanougher

14           here for the defendants.

15                    ANN PHILLIPS,

16   having been first duly placed under oath, was examined

17   and deposed as follows:

18              ------------------------

19                    EXAMINATION

20   BY MS. PARKER:

21   Q.        Good afternoon.

22   A.        Hi.

23   Q.        Would you state your full name for the

24   record, please.

25   A.        It's Ann Margaret, and actually, I got

4

1    married, it's Reed, is my last name.

2    Q.          Congratulations.

3    A.          Thank you.

4    Q.          When did you get married?

5    A.          A year ago in April.

6    Q.          Well, wonderful.

7                Ann, have you ever given a deposition

8    before?

9    A.          Yes, I have.

10   Q.          How many times?

11   A.          Several.

12   Q.          Okay.  Here in Fayette County?

13   A.          Yes.

14   Q.          All right.  I'll ask a little bit more

15   about those in a minute, but you are probably old hat

16   at this, but I'll just tell you so it will guide our

17   discussion today.  It would be helpful to me if you

18   will answer my questions verbally rather than saying

19   uh-uh, uh-huh, shaking your head because we want our

20   record to be clear.  Okay?

21   A.          Yes.

22   Q.          And then if you ever have a need to go

23   off the record, that's perfectly fine.  I'd just ask

24   that if I've asked you a question, that you go ahead

25   and answer it before we go off.  Okay?

5

1    A.          Yes.

2    Q.          And then I tend to talk fast, and I may

3    ask a lawyerly question sometimes.  If you don't

4    understand my question, just let me know.  I'll

5    rephrase it.  If you do answer my question, I'm going

6    to assume that you -- you understood me.  Okay?

7    A.          Okay.

8    Q.          All right.  Are you on any medications

9    today that would effect your ability to testify?

10   A.          No.

11   Q.          Okay.  Let's talk about those

12   depositions.  Were those in -- were you a defendant in

13   any of those deposition, were you a party?

14   A.          Yes.

15   Q.          Did those depositions have to do with

16   your work for Brookdale?

17   A.          No, I've not had any for Brookdale, no.

18   Q.          Okay.  So this would be your first

19   deposition regarding nursing homes or nursing home

20   care; is that right?

21   A.          For Brookdale.  But not nursing home

22   care, no.

23   Q.          Who did you give the other depositions on

24   behalf of?

25   A.          I worked for Golden Living.

6

1    Q.              Okay.

2    A.              And so I had some through them.

3    Q.              Were you an administrator for Golden

4    Living?

5    A.              Yes, I was.

6    Q.              Okay.  I'd like to get a little bit of a

7    sense of your background and educational and work

8    history background.  So --

9    A.              Okay.

10   Q.              -- when did you start working in

11   long-term care?

12   A.              I started working in long-term care when

13   I was in college.  I did my internship at a nursing

14   home.  And I did my practicum in social work, and I

15   worked at a small facility so I helped with admissions,

16   activities and social services.  And so then I

17   graduated in 1990 and then I became a social worker in

18   a nursing home, actually the same one I did my

19   internship, so I did those three jobs with that.  And

20   in 1996 I got my license as an administrator.  So I've

21   been a licensed nursing home administrator now for 23

22   years.

23   Q.              So that 1990 to 1996 period, where was

24   that nursing home located?

25   A.              Georgetown.

1    Q.          Which one?

2    A.          It was called, at the time, Spring Haven

3    and now it is a Signature facility.

4    Q.          Got you.  At the time that you worked

5    there, did it have a parent company affiliated with it?

6    A.          When I first started and did my

7    internship and probably from -- as a social worker, it

8    was Louden and Company, and then it changed over to

9    Extendicare, not the one that you are probably thinking

10   of, but another one owned by Tony Chase.  And then it

11   became Home Quality Management during the time that I

12   had worked there.

13   Q.          Okay.  After you left there in 1996 with

14   your administrator's license, where did you next work?

15   A.          Okay.  So I -- so I worked there some in

16   1990, worked as a social worker, left for a little bit.

17   Came back, was the administrator there for probably

18   about five years.

19   Q.          Got you.

20   A.          And so I think that I left there around

21   2000.

22   Q.          Okay.

23   A.          Okay.  And then I stayed home, I had a

24   baby, my second child, stayed home for a little bit,

25   and then I went to work for Beverly Enterprises at

1    their Frankfort facility.

2    Q.          As an administrator?

3    A.          As an administrator in 2001.

4    Q.          All right.  How long did you work with

5    Beverly?

6    A.          I worked with them -- they were bought

7    out by Golden Living, and I'll just honest with you, I

8    don't know how long they were Beverly versus Golden

9    Living.

10   Q.          Right.

11   A.          But I worked at that facility for around

12   three years.  And then I left, went to a facility in

13   Lexington for about a year, and then I went back to

14   that Frankfort facility for another probably couple

15   years.  You know, I don't know the exact dates on these

16   without having my resume in front of me.

17   Q.          Sure.

18   A.          But I'm -- I'm -- I'm giving you my

19   closest guess.  Then I worked there, and then after I

20   left Frankfort the second time, I worked at another

21   facility in Lexington that was owned by the other one

22   that I worked in between, if that makes sense.

23   Q.          Another -- another nursing home where you

24   used to work?

25   A.          Yeah -- yeah, I worked at -- let's see.

9

1    When I left Golden Living the first time, I worked at

2    Pimlico, and it was owned by John Vincent, and then I

3    went back -- I went back to Frankfort.  That's where my

4    house was, and I was unable to sell my house and I went

5    back there.  And then later on, I went back to work at

6    another one of John Vincent's facilities in Lexington.

7    And then after that, I went to Sayre Christian Village

8    Nursing Home and I was there for over five years.

9    Q.          And Sayre Christian Village, who are they

10   affiliated with?

11   A.          They are a nonprofit faith-based

12   organization, standalone facility.

13   Q.          Got you.  Okay.

14   A.          I was there for over five years.  I left

15   there to be the executive director of the campus for

16   Brookdale and I was there -- and I've got these dates

17   written here, if you want to see this, and if you can

18   read my chicken scratch handwriting, that's all it is

19   are dates.  I was the ED for Brookdale, October 2016 to

20   February 2018.  And then I was the administrator,

21   February 2018 to August of 2018.

22   Q.          And are you still at that campus?

23   A.          No, I'm not.  I left in August of 2018.

24   Q.          And do you work anywhere now?

25   A.          Yes, I do.  I work at Sayre Christian

10

1    Village where I had worked previously as the

2    administrator.

3    Q.          That standalone facility?

4    A.          Yes.

5    Q.          And so you are the administrator right

6    now of Sayre Christian Village?

7    A.          Yes, I am.

8    Q.          The structure of having an ED versus an

9    administrator is a little bit unique to me or a little

10   bit unique I think to Brookdale.  Did any of the other

11   places that you worked during your career have this

12   ED/administrator structure?

13   A.          Excuse me.  Yes.  Actually, Sayre

14   Christian Village is part of a continuing care

15   retirement community, kind of like Brookdale was.  And

16   even right now there is an executive director for the

17   campus and then I'm the administrator for the nursing

18   home.  The executive director for the campus currently,

19   and the one prior when I was there at Sayre Christian

20   Village, did not have an administrator license.

21   Q.          Got you.  So when you were being the

22   executive director for the campus over at Brookdale,

23   what were your job duties on a day-to-day basis?

24   A.          When I was the executive director at

25   Brookdale, my office was in independent living.  Okay.

11

1    We had 182 apartments over there and the nursing home

2    was actually down the street, and you had to actually

3    get in the car to drive to the nursing home.  But I had

4    182 independent living apartments, 21 memory care, and

5    then 60 PC.  My main job was to oversee independent

6    living and I had someone that helped run PC and then I

7    had an administrator that took care of the nursing

8    home.

9    Q.          So when we say "PC," we mean personal

10   care?

11   A.          Personal care, yes.

12   Q.          Independent living, personal care, and

13   then the nursing home?

14   A.          And memory care.

15   Q.          And memory care.  Okay.  It's my

16   understanding that there may be a walking path

17   connecting the nursing home to the other side of the

18   campus; is that correct?  Paved?

19   A.          No.  I mean, you could -- I guess you

20   could go out on the street and walk a sidewalk down

21   through Man o'War and I know the sidewalk continues

22   through there.  But to walk back in behind there, I'm

23   not aware of that.  I never was.

24   Q.          Okay.  So in terms of the personal care

25   home, there was a director of the PCH?

                                                        12

1    A.           Uh-huh (affirmative.)

2    Q.           For the record is that yes?

3    A.           Yes.  Sorry.

4    Q.           That's okay.  For the memory care who was

5    the -- was there a director role of memory care?

6    A.           Yes.  She kind of helped oversee PC and

7    the memory care.  Uh-huh (affirmative.)

8    Q.           And then for independent living, was

9    there a director role?

10   A.           That was more -- that was my position as

11   the executive director.

12   Q.           Okay.  And then you were also in charge

13   of, like, if the administrator of the skilled nursing

14   facility had a question, that person would come to you

15   with that question; is that correct?

16   A.           Yes.

17   Q.           So the --

18   A.           They could come to me, yes.

19   Q.           Okay.  Tell me about how the chain of

20   command worked.  So over at the skilled nursing

21   facility, we have the director of nursing, who I would

22   assume would report to the administrator, who reports

23   to you; is that correct?

24   A.           Correct.

25   Q.           And who do you report to or who did you

13

1    report to?

2    A.          I reported to -- let's see, when I first

3    started it was -- I've gone blank.  Her name is Sherry.

4    Q.          Robinson?

5    A.          Robinson.  Thank you so much.  Yes.

6    Sherry Robinson and her title, she was VP.  And then a

7    little bit later on they changed regions and then I got

8    a new boss and her name was Cheryl Sarver and her title

9    was district director of operations.

10   Q.          And during your time as executive

11   director, who was your employer?

12   A.          Brookdale.

13   Q.          Okay.  Now, Cheryl Sarver, district

14   director of operations, I believe Ms. Robinson is a

15   senior vice president.  Did you report to anyone at any

16   time above those roles like their bosses, for instance?

17   A.          Did I have -- are you saying did I have

18   communications with them?

19   Q.          Yes.

20   A.          Yes.

21   Q.          Okay.  What types of things and what --

22   what people?

23   A.          Cheryl Sarver was the district director

24   of operations and then her boss, I think, was more like

25   Sherry's position and it was a vice president position.

                                                          14

1    And her name was Beth Mell.  And we -- I would

2    occasionally -- we'd have -- I'd have phone calls with

3    her in conjunction with Cheryl, in conjunction with

4    other people, mainly they focused on IL and sales and

5    apartments and things like that.

6    Q.          Independent living, is that what you

7    mean?

8    A.          Yes.

9    Q.          And you will have to bear with me,

10   sometimes I'm going to ask you to flesh out those

11   acronyms.

12   A.          Right.

13   Q.          Okay.  So you were meeting with Ms. Mell

14   about the independent living side of the house; is that

15   right?

16   A.          For the most part, yes.

17   Q.          Did you-all also discuss the skilled

18   nursing?

19   A.          Yes.

20   Q.          What types of things did you discuss

21   about skilled nursing?

22   A.          There was a -- you know, like a weekly

23   overtime report that I would do.  IL and PC and memory

24   care were basically one entity with that and then the

25   nursing home was the next entity.  Now, of course, the

15

1    information that I got from that was from the nursing

2    home administrator.

3    Q.          And so that combined report, is it a

4    combined report regarding overtime?

5    A.          There were two different reports.  They

6    were -- they were considered separately.  The nursing

7    home had theirs and then I -- independent living,

8    personal care, and memory care had theirs.

9    Q.          Would you send them to folks up the

10   corporate chain in the same e-mail or different

11   e-mails?

12   A.          Are you talking about the nursing

13   home -- what -- in conjunction with the other facility?

14   Q.          I thought that you were saying that you

15   reported that overtime report up your chain; is that

16   correct?

17   A.          Correct.

18   Q.          When you reported that overtime report up

19   your chain, did you do both reports at the same time or

20   did you do one report and then the other?

21   A.          The one report was done by the nursing

22   home administrator.  So they may not have been sent at

23   the same time.

24   Q.          I see.  So you were not responsible for

25   sending the nursing home administrator's overtime

16

1    report?

2    A.            I did not do that report, but he would
3    give that to me.

4    Q.            Okay.

5    A.            So if it was done at the same time when I
6    sent mine, sometimes it could have been and sometimes
7    it would have been separately.  Depending on when he
8    gave it to me.

9    Q.            Got you.  Other than the overtime report,
10   which you have told me about, did you do any other
11   reporting up the chain?

12   A.            We had other -- we had other calls like
13   sales calls and stuff like that, that main focus was on
14   independent living, memory care, and personal care.

15   Q.            So those sales calls, did those
16   calls -- who -- who would have been on those calls?

17   A.            On the sales calls would generally be
18   Cheryl Sarver, who was my boss, the district director
19   of operations, she was on there a lot.  Maybe not
20   always.  There was a regional salesperson and at one
21   time -- and those people changed a couple of times.
22   But Michelle Lacrecio was in charge of sales.  And then
23   I had a sales manager or director for IL, PC and memory
24   care, and she was on that call.  And then it was other
25   PC and ILs that talked about census and talked about,

1     you know, where they were with open -- openings and

2     apartments and -- and where they were -- what they

3     expected to be by the end of the week, the end of the

4     month.

5     Q.          Were the admissions folks from the

6     skilled nursing facility involved in those calls?

7     A.          I don't believe that they were on those

8     calls.

9     Q.          When you had those sales call, were any

10    members of Brookdale's marketing department on those

11    calls?

12    A.          Well, the salesperson that I'm telling

13    you about, that's like a regional person, would be

14    considered in the marketing department.

15    Q.          Okay.

16    A.          And then my sales managers or director of

17    that was over IL, memory care and PC with sales would

18    be considered a marketing person.

19    Q.          Now, the way that the campus was set up

20    as a CCRC, did you-all market -- was it -- was it set

21    up in a traditional way where someone could pay a fee

22    to enter the lowest level of care and stay all through

23    their lives to the highest level of care, or was it set

24    up differently than that?  Like was it an entry fee

25    facility?

18

1    A.          No, it was not an entry fee facility.

2    Q.          Okay.  So there was no flat rate somebody

3    could pay on the front end to get into the PCH, for

4    instance, that would allow them to get care later at

5    the skilled nursing facility?

6    A.          It was not an entry fee facility.  It was

7    not an entry fee facility.  Obviously, we would try to

8    take people that were in PC and memory care if they

9    ended up needing a higher level of care.  We would like

10   to have them on the campus and keep them within that.

11   Q.          Was there a payment structure where

12   somebody could pay while they were in the PC or memory

13   care in order to guarantee a spot or a bed in the SNF?

14   A.          No, there was not.

15   Q.          Okay.  Other than the sales calls we've

16   been discussing, did you have any other regular

17   reporting to anyone affiliated up your chain of

18   command?

19   A.          During my time as the executive director,

20   is that what you are asking me?

21   Q.          Yes.

22   A.          Not -- not regular calls that I can

23   recall.

24   Q.          Okay.  How often did you and the

25   administrator of the skilled nursing facility meet

                                                        19

1    during your tenure as executive director?

2    A.          I would try to go over there possibly

3    once a week for -- for a little bit.  He occasionally

4    would come to our executive team meetings that we would

5    have over in IL.

6    Q.          And when you say "he," do you mean

7    someone specific?

8    A.          When I was the executive director for

9    Brookdale, the first administrator that was there was

10   Randy Conforti.  Okay.  And Randy was there.  And Randy

11   was actually an interim that was hired when I -- he was

12   already there before I got there as the executive

13   director.  He was an interim.  And then Randy left, and

14   Terry Tackett became the permanent administrator.  But

15   he wasn't there very long, and I think he really just

16   wanted interim work.  I think it was just something for

17   him to do interim.  And then Randy Conforti came back

18   as the administrator.  I don't know their exact dates,

19   but for the most part, probably Terry probably wasn't

20   there more than, I don't know, a couple of months, two

21   or three months.  I'm not certain what that is, but for

22   the most part, it was Randy Conforti but he would be

23   one of them.

24   Q.          Was Randy an employee of Brookdale?

25   A.          Randy was not an employee of Brookdale in

                                                        20

1    the beginning when he was an interim.  I can't remember

2    what the name of that company was that he worked for

3    like 360 Staffing, some -- something like that.  I'm

4    not sure.  I don't recall the name of it specifically.

5    But when I first started as the ED, he was interim,

6    like I said, and then Terry came on, Terry was employed

7    by Brookdale as permanent.  When I said "permanent"

8    earlier is what I meant.  And then when Randy came back

9    after Terry left, Randy was employed by Brookdale.

10   Q.          Okay.  Did Terry leave voluntarily?

11   A.          Yes.  He did.

12   Q.          What was his reason for leaving?

13   A.          Terry did a lot of interim work and

14   I -- like I just said a minute ago, I feel like that

15   was his plan in the first place and he just, I don't

16   feel, wanted to spend the time that he needed to spend

17   the time in -- interim work is a little bit different

18   than permanent work.

19   Q.          Okay.  How so?

20   A.          Well, I mean, there's two types of

21   interim work.  You are either, one, you're going to try

22   to keep the seat warm, or two, you are going to work at

23   a place that's got a lot of work and -- and things like

24   that to do during that time.  But I don't think the

25   accountability is there as much.

21

1    Q.          I got you.  Either like a crisis
2    situation or you are looking for a permanent role to
3    fill in?
4    A.          I -- it may be a crisis situation and
5    there's no administrator there or you are -- or
6    administrator like having a baby and you are staying
7    there for a month while they're out having the baby,
8    and you are not going to make any huge decisions
9    because you are not going to be there permanently.
10   Q.          Right.
11   A.          But Terry did a lot of interim work.  My
12   personal opinion is I don't think Terry really liked
13   doing the day-to-day stuff.  He liked just coming in,
14   doing stuff, and then leaving and going to the next
15   place.
16   Q.          Did Randy leave those positions
17   voluntarily?
18   A.          Randy?
19   Q.          Yes.
20   A.          Yes.  Well, I mean, the first time Randy
21   was interim.  And that part of interim is there is no
22   for sure -- you know, we -- the plan was and Randy
23   always said he didn't want to stay permanently.  He was
24   with an interim company.  And both times that he -- I
25   mean, we -- we had hired a permanent administrator the

                                                    22

1    first time so he left voluntarily.  It was a contract.

2    And then the second time Randy left voluntarily.

3    Q.          Okay.  Why did he leave the second time?

4    A.          The second time he left I had talked to

5    him, he was going to be put on an action plan just

6    some -- just with some stuff that we wanted to have

7    done there and I just don't think that Randy wanted

8    to -- he didn't want to fool with that.  Randy was also

9    used to doing a lot of interim stuff as well.

10   Q.          What type of action plan was he going to

11   be put on?

12   A.          Just -- just mainly not even -- it's some

13   goals -- some goals to get some stuff -- goals to get

14   stuff done.

15   Q.          What -- what kind of stuff?

16   A.          Just -- I don't recall exactly.  Exactly

17   I think that, you know, one would be to try to improve

18   the, you know, turnover of the building, decrease

19   overtime, fill staffing positions.

20   Q.          Okay.  Anything else you can think of?

21   A.          No.

22   Q.          Overtime, fill staffing and you said one

23   other thing, fill open positions; is that what you

24   said?

25   A.          Uh-huh (affirmative.)

23

1    Q.          And then after Randy left, you stepped
2    into that role; right?
3    A.          Correct.
4    Q.          Why did you decide to do that?
5    A.          I was -- I'm trying to think.  I did not
6    like the -- skilled nursing is what I love to do and
7    that is my passion, to be honest with you.  I
8    had -- you know, I've got over 20 years' experience in
9    skilled nursing, I didn't really like the independent
10   living side, and obviously, I had a huge job with the
11   big campus that I had.  And they had -- they were
12   wanting me to go and work in the nursing home and stay
13   in the nursing home and -- but yet, I'm held
14   accountable for all of the other stuff too, so I
15   thought, you know, if I have to do this, I'll just be
16   an administrator somewhere.
17   Q.          How long had they been asking you to work
18   and stay in that nursing home consistently?
19   A.          Not too long before I did.  Given Randy
20   getting ready -- but I never even put Randy on an
21   action plan and started talking to him about it.  He
22   said you know what, I'm just going to leave.  I don't
23   really want to do this, that type of thing.  And so he
24   had given his notice and then, at that point in time,
25   my boss said, you know, what I want to do is I want to

24

1   find someone to come over here and work temporarily in

2   IL and PC, and I'm going to put you over in the nursing

3   home.

4   Q.          Sounds like you were the consistent

5   person on campus when all of these changes were going

6   on with the administrator at the SNF; is that fair?

7   A.          Well, I there was from October of 2016 to

8   February of 2018 as the executive director.  Yeah, so

9   with Randy being interim and then there being Terry and

10  then Randy coming back, you could say that.

11  Q.          Why did you decide to leave Brookdale in

12  2018, August of 2018?

13  A.          I agreed to go and be the administrator

14  there for a little bit and did not plan on staying

15  there as the administrator.  So I just -- I didn't

16  agree with -- with some stuff that my boss wanted me to

17  do.  And I'm not talking about anything unethical.

18  It's just didn't agree with some decisions that she had

19  and just felt like it was just -- I was working a lot.

20  I had just gotten married and I was working 12, 14

21  hours a day and it was time for me to do something

22  else.

23  Q.          What kind of disagreements did you have

24  with your boss?

25  A.          One of the disagreements that I had

                                                              25

1   was -- I mean, I wouldn't say disagreements.  Just -- I

2   don't know.  She -- she wanted me to put Randy and

3   Amanda both on an action plan at the same time.  I did

4   not feel like that was a good idea.  I didn't feel like

5   that was the best thing for the SNF.  Certainly not the

6   best thing for me either.

7   Q.          When you say "Amanda," do you mean Amanda

8   Mather?

9   A.          Uh-huh.  (Affirmative.)

10   Q.          Okay.

11   A.          Yes.

12   Q.          That -- that was the DON at the time;

13   right?

14   A.          Yes.

15   Q.          What was the action plan that they wanted

16   Amanda to go on?

17   A.          You know, I don't recall exactly.  It's

18   kind of the same thing.  Just with, you know, making

19   sure that the -- the -- the staffing positions are

20   filled and overtime is -- you know, at a minimum.

21   Obviously, if you have some openings you are going to

22   have overtime to fill those.

23   Q.          Right.  Right.  Why was corporate so

24   concerned about overtime?

25                   MR. COCANOUGHER:  Object to form.

26

1    A.            Well, I mean, I think just with -- with -
2    with anyplace, you want to, you know, why do you have
3    it, let's -- let's get -- you know, let's get people in
4    here permanently.  What do we need to do to hire people
5    to get them in here permanently so we're not
6    overworking people or -- and it is -- I mean, it is a
7    higher rate.
8    Q.            Is overtime -- by "higher rate," do you
9    mean it's -- it's more pay per hour?
10   A.            Yes.
11   Q.            Okay.  Like time and a half, was that
12   what it was at Brookdale?
13   A.            That would be overtime, yes.
14   Q.            Got you.  Were there any other reasons
15   that -- that corporate wanted to put Amanda on an
16   action plan?
17   A.            I don't -- I don't recall exactly.  That
18   was just -- that was just something that Cheryl Sarver
19   wanted done a lot to a lot of people.  Not necessarily
20   just the SNF.  It happened over in IL too a lot.
21   Q.            Regarding overtime or regarding other
22   things?
23   A.            Just other things.
24   Q.            Okay.  What kind -- what kind of things?
25   A.            Just -- just, you know, any type

27

1    of -- any type of performance or -- or whatever,

2    someone that she just came in and met and didn't think

3    was doing a good job, she felt like they needed to be

4    on an action plan.

5    Q.          And in it terms of Brookdale's -- the way

6    their employee policies are set up, is an action

7    plan -- do you put someone on an action plan because if

8    they don't get better, you are going to terminate them,

9    is that the idea --

10   A.          Yeah, yeah.

11   Q.          -- or explain to me --

12   A.          Yeah, I mean, I say action plan, but

13   process improvement plan or you can say process

14   improvement plan.  But ultimately, not necessarily to

15   terminate them, but you know, to set them up, give them

16   goals and at times, yeah, they don't make it.

17   Q.          I'm thinking like a -- like a PIP, which

18   would be step one on a disciplinary process,

19   essentially, is that fair?  Is that what you are

20   talking about?

21   A.          In some cases, yes.  Not always.  Some of

22   it was just more to establish goals and stuff for them

23   to do and to improve.

24   Q.          With Randy and Amanda was it to establish

25   goals or was it the first step of a disciplinary

28

1    process?

2    A.            I feel that -- you know,

3    probably -- probably disciplinary but, I -- I mean, I

4    can't really speak for what all she had in mind.  I

5    don't know what all she had in mind.  I'm saying "she"

6    as in Cheryl.  The -- the facility had recently had a

7    survey and received two minor deficiencies which was

8    really good, below state and national average.

9    Q.            Why -- why do you mention that survey?

10   A.            Well, I mention that because, I mean,

11   that -- I mean, I -- I feel like that that was huge and

12   that spoke a lot for how they did, how they were

13   doing --

14   Q.            Got you.

15   A.            -- in their roles.  Amanda and Randy were

16   doing in their roles.

17   Q.            Got you.

18   A.            It's a good survey.

19   Q.            So is it fair to say that you didn't

20   think the performance plan would have been justified

21   based on that survey?

22   A.            Correct.

23   Q.            And that performance plan was based on

24   concerns with overtime; is that correct?

25   A.            Not -- no, it wasn't just -- it wasn't

                                                    29

1    just overtime.  I mean, I also believe that it had some

2    personality stuff with her potentially with that.  But

3    that's just my opinion, okay, just -- just -- just to

4    be honest with you.  And that's part of the part where

5    I felt like that we did not totally agree.  Okay.  I

6    think that no one is perfect and -- but I do believe

7    that Randy and Amanda worked very hard and they had a

8    very good survey.

9    Q.          Did you and Cheryl have any other

10   differences of opinion that -- during your tenure?

11   A.          I -- I don't know.  I mean we pro --

12   we -- we probably did.  I mean, I'm not one that's

13   going to argue with somebody.  The IL world is not

14   really my world.  I -- I was successful there during

15   the time that I was there but that's not something --

16   selling apartments is not what I want to do and wanted

17   to do.  I wasn't really happy in that position.  I'd

18   much rather be a nursing home administrator.

19   Q.          Did Randy and Amanda report to

20   you -- Randy or Amanda report to you issues with

21   staffing at Richmond Place?

22              MR. COCANOUGHER:  Object to form.

23   A.          Yes.  They had some issues with staffing

24   just -- it's a challenge everywhere.  It -- it truly

25   is.  But we -- you know, we worked on it, they worked

                                                            30

1    on it.  We paid bonuses.  We paid overtime to whatever

2    we needed to do to get the positions filled so the

3    residents were taken care of.

4    Q.          What kind of issues did Randy and Amanda

5    report to you with regards to staffing?

6    A.          That the -- just, you know, just the

7    concerns of just recruiting people, getting the

8    positions filled.  At times, you know, they would meet

9    a couple of times a day with staffing to try to get the

10   positions filled.  We had people on call that, you

11   know, that would have to -- somebody would have to come

12   in and work if somebody called in.  It was just

13   a -- you know, at times it was a -- a -- a puzzle to

14   work on to get together.  And, you know, in those two

15   roles, that could be stressful at times, yeah.

16   Q.          Did you take those concerns that they

17   presented to you on up your corporate reporting chain,

18   did you make anybody aware above you of those staffing

19   challenges?

20                   MR. COCANOUGHER:  Object to form.

21   A.          Yes.

22   Q.          Who?

23   A.          I -- I would talk -- mainly Cheryl Sarver

24   or Beth Mell, you know.

25   Q.          And what did you tell those folks about

                                                        31

1   staffing at Richmond Place?

2   A.          Just, you know, that we, you know, just

3   trying to come up with ideas for recruiting people in

4   positions to, you know, so the people on call aren't

5   working so much.  Having to come in and fill those

6   positions and, you know, Randy and Amanda spent a lot

7   of time on staffing and making sure that the facility

8   was covered.

9   Q.          Were there any -- was there any one type

10  of position that you-all were trying -- were having

11  difficulty filling versus any other?

12  A.          When I was the executive director, is

13  that what you are asking me?

14  Q.          Really anytime that you were at Richmond

15  Place, but...

16  A.          Well, I mean, you are mainly in the --

17  the -- the main two positions that every nursing home

18  is having difficulty filling positions with.  Right now

19  is, and then, was just nurses on the floor and

20  certified nursing assistants.  It was a challenge.

21  Q.          When you say "nurses on the floor," do

22  you mean RNs and LPNs or one over the other or both?

23  A.          Oh, both.

24  Q.          Both.  Okay.  What did you-all try to do

25  to fix those shortages?

                                                          32

1                  MR. COCANOUGHER:  Object to form.

2      A.           Well, we had -- we had management nurses

3      on call and, you know, we had unit managers -- one of

4      the things that I did as administrator to help fix that

5      is when I had a medical records position come open, I

6      hired a nurse in that position, I had admissions

7      position come open, I hired a nurse in that position, I

8      had three unit managers, so anyway -- with all of the

9      nurse managers we had a staffing person became a nurse.

10     I had seven people in that rotation to try to work on

11     their on-call rotation to make things easier for them.

12     So then you were on call one day a week versus a week

13     at a time.  Sat down and worked with them on what would

14     be the best way for them to be on call to fill those

15     positions because, you know, our main thing was to make

16     sure that the patients were taken care of.

17     Q.           What was the response from corporate when

18     you brought those staffs concerns to corporate's

19     attention?

20                  MR. COCANOUGHER:  Object to form.

21     A.           We -- I'm just trying to think.  We did

22     some -- you know, tried some different things, did some

23     changes in the schedule, you know, took a look at the

24     staffing numbers, where we're having the issues at.

25     Obviously, if you are a nurse manager and you work

                                                          33

1    days, it's going to be harder for you to work a night

2    shift position.  Managing that, looking at that,

3    looking at our staff numbers trying to make sure that

4    we have the best amount of staff at the best times,

5    that type of thing.  We offered bonuses to get people

6    to come in to work.  We had the people on call.  We

7    asked more people on call by having more nurses work

8    there.  And then eventually we started utilizing the

9    agency.

10   Q.          What agency?

11   A.          There was a couple of different ones, and

12   I'll be honest with you, I don't remember the names of

13   them.  But we used a couple different agencies.

14   Q.          And when you say you look at the staffing

15   numbers, from your role as -- as both the administrator

16   and the ED, what were you looking at, were you looking

17   at staffing ladders or punch detail?

18   A.          Looking more at, like, staffing ladders

19   and, you know, it would be me as the ED in conjunction

20   with the administrator.  We had a corporate nurse

21   consultant looking at that too.  We just, for instance,

22   on night shift there was the same amount of nurses as

23   there was on evenings and days and that's not typical.

24   And so we took a look at not having as many nurses on

25   night shift but having a house supervisor that can kind

                                                    34

1    of supervise and fill in and -- and -- and that type of

2    thing and be in charge but alleviate a little bit of

3    having to fill that night shift person with a manager.

4    Q.          Who was the corporate nurse that was

5    helping you with that?

6    A.          Vicki Lunsford.

7    Q.          And was Ms. Lunsford a Brookdale employee

8    or --

9    A.          Yes.

10   Q.          What was her -- was her title just

11   corporate nurse or did she have a specific title?

12   A.          I forgot what her specific title was.

13   Q.          Was she from Kentucky or from elsewhere?

14   A.          She's from Kentucky.  She actually has a

15   nursing home administrator license, and she was a

16   director of nursing for several years.  She's an RN.

17   Q.          So when you-all were looking at those

18   staffing ladders, was that a meeting that you-all had

19   in person or over the telephone, teleconference?

20   A.          I'm thinking that -- I mean, I don't

21   know.  I mean, I believe that we probably met with

22   Cheryl Sarver and Vicki and -- and some of it may be on

23   the phone, some of it may have been in person.

24   Q.          How often did you receive the staffing

25   ladders?

1    A.          I don't -- I don't remember.

2    Q.          Once a month at least?

3    A.          What do you mean by the "staffing

4    ladders," just --

5    Q.          Well, I'll show you what's been produced

6    to me as the ladders.  You let me know if this looks

7    familiar to you.  Here they are.  Does that look

8    familiar?

9    A.          Not really.

10   Q.          So explain to me what you were looking at

11   when you look at staffing because I've got to go find

12   the document that you were looking at.

13   A.          I'm -- I'm not saying that I was looking

14   at a specific document.  Just us discussing staffing

15   and how many nurses we have on this shift, how many

16   nurses we have on this shift, how many nurses we have

17   on this shift.  When you have two -- let's see, when --

18   when you have two nurses stations, two main nurses

19   stations like we did, and you do 12-hour shifts, you

20   can't go down to -- it's hard to go down to one nurse

21   on 11 to 7 because you want two on day shift, you want

22   two on evening shift, if that makes sense; right?

23   Q.          It does.

24   A.          Just looking at that whole schedule, I am

25   not a good person to do a schedule.  That's not my

36

1    forte.

2    Q.          Were you ever looking at the PRD of the
3    building or the HPPD?

4    A.          What do you mean by "PRD."

5    Q.          Is per resident day, hours per resident
6    day.

7    A.          Oh, okay.  I don't recall specifically
8    what that was.  I don't -- I don't know.

9    Q.          In your role as an administrator now, do
10   you have a PRD that you are looking to hit with your
11   staff?

12   A.          We have a certain number of people that
13   we -- we want to have, depending on what our census is.
14   But that is something that, you know, you may look at,
15   and then if your census fluctuates, you know,
16   obviously, just like any place or hospital, then if
17   you're -- if you're above that amount, you may look at
18   cutting that staff.

19   Q.          What's your number that you look at now?

20   A.          We just look -- we don't look at the PPD
21   number.  I don't have a PPD report where I'm at right
22   now.

23   Q.          Okay.  Did you have one at Brookdale?

24   A.          I'm trying to think.  I can't remember if
25   we did or not.

37

1    Q.          So you can't remember if corporate

2    communicated to you in any way regarding how to staff

3    the building?

4                    MR. COCANOUGHER:  Object to form.

5    A.          The staffing was already set up before I

6    got there and where it was compared to what

7    I'm -- compared to what I've seen, the staffing was

8    good.  We discussed the staffing and trying to figure

9    out what we could do to make improvements.  And part of

10   that was with the night shift, and with Vicki Lunsford,

11   the nurse consultant's experience, she felt like that

12   was the place that we were spending the most time with

13   Amanda, as the director of nursing, having to work the

14   floor or one of the unit managers having to work the

15   floor was on night shift, where if we could fix that

16   where we don't have so many nurses, like most nursing

17   homes do, or you don't have as many on 11 to 7, the

18   need there is not as much, you don't have a lot

19   of -- you don't have meals going on, you don't have

20   showers going on.  It's -- it's -- it's a little bit

21   different, most people are in bed so it is quieter.

22   We -- we -- we just looked at that and then her opinion

23   she felt like that might help to take that

24   person -- take basically the two nurses off, but then

25   we had one supervisor that could go and help with both

1    units versus having to constantly replace somebody on a

2    11 to 7 when the typical nursing home did not have that

3    many people on 11 to 7.

4    Q.          So staffing was set up when you got

5    there; correct?

6    A.          Correct.

7    Q.          Did you have any -- did you change

8    anything about staffing at any point in time while you

9    were there other than what you have already told me

10   about switching out some people during that one shift?

11   A.          And I told you that I added nurses to a

12   lot of the positions once they came open to the medical

13   records position, to the admissions positions, and to

14   the staffing position.  Did that when I became the

15   administrator there.

16               There was a -- it seems like that there

17   was a lot of PRN people on the -- on the schedule, and

18   we wanted to make them full time or at least part time.

19   Because you had a lot of people that are just PRN

20   picking and choosing when they wanted to work when we

21   really needed to try to fill those positions with

22   full-time people.

23   Q.          And anything else that you did regarding

24   staffing?

25   A.          I don't -- I don't recall anything else

39

1    in particular.

2    Q.          Did you have any discretion in your role

3    as the ED or as the administrator to vary the amount of

4    staff on every shift?  Like if you wanted to add three

5    nurses on every shift, could you have done that?

6    A.          No.

7    Q.          Why not, what would you have had to do to

8    do that?

9    A.          I would have to talk to my boss, Cheryl

10   Sarver, and -- yeah, before I could just add three

11   nurses.

12   Q.          Now, where did the budget for the

13   facility come from?

14   A.          The budget for the nursing home or --

15   Q.          Let's do both.  So was there a rolled up

16   budget for the campus?

17   A.          There was a -- so the nursing home was

18   always separate from the IL and PC and memory care,

19   first of all.  Okay.  They were always separate.

20   Separate budget.  If I recall correctly, they did those

21   budgets in October, so the first year as executive

22   director I had nothing to do with that budget.

23               The second year, as the executive

24   director, Cheryl Sarver, myself -- I'm not sure who

25   else -- other people were involved in that.

40

1    Q.          So you and Cheryl Sarver and some other
2    folks at the corporate level were in charge of that
3    budget?
4    A.          Yeah, I believe so.
5    Q.          Okay.  How was that budget -- how was it
6    communicated to you?  Was it sent via e-mail, was it
7    faxed over, carrier pigeoned?
8    A.          I would say e-mail but I -- I don't
9    recall exactly.
10   Q.          Did you receive a -- like a draft budget,
11   like a working budget before you received the final
12   version or did you only ever receive at final budget?
13   A.          I don't recall.
14   Q.          Do you have any -- did you have any
15   availability to vary the amounts that were listed in
16   that budget?  Like if they sent you a budget that, you
17   know, contained 400,000 for nurses for the year, RNs
18   for the year, could you ask for more funds?
19   A.          Well, first and foremost, we took care of
20   filling -- filling the open positions to make sure that
21   the residents were taken care of.  So I'm not thinking,
22   oh, this is an RN and the budget says an LPN today.
23   No.  You'd go on and put an RN in there.  Whoever you
24   needed to to take care of the patients.
25   Q.          I'm talking about your annual budget.

                                                         41

1    Like if you got an annual budget and you did not -- you

2    wanted more funds in a specific category.  Did you have

3    any ability to go back to anyone at corporate and

4    negotiate on that or did you just kind of receive the

5    budget and that's -- that's what you were going to get

6    in terms of funds?

7    A.          I think that they got my opinion on some

8    things and, you know, I gave them my opinion on some

9    things.  Some of it they may have gone by, some of it,

10   no.

11   Q.          Did you recall anything specifically

12   changing on the budget as a result of your opinion?

13   A.          Not -- I don't recall anything specific

14   offhand, no.

15   Q.          Do you have a clinical license like an

16   RN, LPN license?

17   A.          No.

18   Q.          Do you still have a social work license?

19   A.          No.

20   Q.          What's the difference from an

21   administrator perspective of an RN versus an LPN?

22   A.          I mean, I know what the difference is as

23   far as school and things like that.  Sometimes you can

24   find LPNs that are better nurses than RNs.  In a

25   nursing home, typically, LPN -- a lot of RNs are

                                                          42

1    usually in management positions or they work in a
2    hospital, so there are more LPNs in a nursing home than
3    there are RNs.
4    Q.          So RNs get paid more; right?
5    A.          Yes, they do.
6    Q.          Per hour?
7    A.          They have more school, more education.
8    Q.          LPNs have to practice under the
9    supervision of an RN; right?
10                    MR. COCANOUGHER:  Object to form.
11   A.          In a nursing home the regulation is that
12   you have an RN eight hours a day.
13   Q.          Right.  But I'm talking about the
14   Kentucky Nurse Practice Act.  LPNs have to practice
15   under the supervision of an RN; right?
16                    MR. COCANOUGHER:  Object to form.
17   A.          They don't have to necessarily be
18   supervised under an RN.  You don't have to have an RN
19   all the time when an LPN works, no.
20   Q.          Okay.  So you, as an administrator of
21   Richmond Place and the -- and a current administrator
22   of a building, is it fair to say that you don't see any
23   clinical difference in a nursing home setting between
24   an L -- LPN and an RN?
25                    MR. COCANOUGHER:  Object to form.

43

1    A.            Well, like I said to you a few minutes

2    ago, I've seen some LPNs be actually better nurses, in

3    my opinion, than RNs sometimes.  You know, maybe it has

4    to do with experience and things like that.  I'm

5    sorry -- ask me your -- ask the question again because.

6    Q.            As an administrator, is it fair to say

7    that you don't think there is a clinical difference in

8    a nursing home setting between an LPN and an RN?

9                        MR. COCANOUGHER:  Object to form.

10   Q.            In other words, you would feel

11   comfortable staffing all LPNs versus a certain number

12   of RNs and LPNs?

13                       MR. COCANOUGHER:  Object to form.

14   A.            Yeah, in a nursing home setting, I think

15   LPNs are fine to work in a nursing home setting.  The

16   regulatory requirement is to have an RN eight hours a

17   day.  In most nursing homes, let's just say for

18   instance, where I'm at right now, my director of

19   nursing is an RN, my staff development person is an RN,

20   they do all of the training and stuff of the LPNs.  We

21   do competencies on people that are LPNs and RNs.  My

22   assistant director of nursing is an RN.  My MDS

23   coordinator is an RN.  So LPNs working the floor, and

24   even in management roles, I've had LPNs work as unit

25   managers and them be better than RNs.  Sometimes LPNs

44

1    are a little bit more -- they're more task oriented and
2    can do a better job.
3    Q.          And they cost less per hour as well;
4    right?
5                    MR. COCANOUGHER:  Object to the form.
6    A.          Yes.  But you know, with shortage of
7    nurses, you don't have -- you know, you don't have time
8    to say, Oh, I'm going to try to save money and just get
9    an LPN in here.  You want to get a nurse in to take
10   care of the residents and -- and sometimes LPNs are as
11   good as the RNs.
12   Q.          Now, you mentioned taking care of the
13   residents.  You'd agree with me that the facility has
14   to be adequately staffed to take care of all resident
15   needs; right?
16                   MR. COCANOUGHER:  Object to form.
17   A.          Yeah.  Yes, you have a certain amount of
18   staffing that you want to have, yes.
19   Q.          And if a facility is not adequately
20   staffed to take care of all the resident needs, that
21   could cause harm to the residents; right?
22                   MR. COCANOUGHER:  Object to form.
23   A.          It depends on what you are talking about
24   about being adequately -- adequately staffed.  I don't
25   -- I don't know where you are getting at.

                                                        45

1    Q.          Not -- I'm not trying to trick you.  It's
2    just, my question is simply, if you have a facility
3    that doesn't have enough staff that can lead to patient
4    harm, would you agree with that?
5                    MR. COCANOUGHER:  Object to form.
6    A.          Anything is possible.  I mean, something
7    could happen and you have plenty of staff.  Things
8    happen unfortunately.
9    Q.          Right.  For instance, but if you have a
10   hundred-bed facility and one person on staff that could
11   lead to patient harm, couldn't it?
12                   MR. COCANOUGHER:  Object to form.
13   A.          If you have a hundred-bed facility and
14   what?
15   Q.          And you have one person on staff, that
16   could lead to harm?
17   A.          Well, yeah.  That's not going to happen,
18   though.
19   Q.          You said you want a certain amount of
20   staff on shift and I just want to clarify for the
21   record that sitting here today, as an administrator and
22   a current administrator, that you don't have any idea
23   what the PRD should be for residents; is that true?
24                   MR. COCANOUGHER:  Object to form.
25   A.          I mean, I have an idea what I would

                                                          46

1    like -- like to have.  Do I have -- and I have a set

2    number of staff.  Is there a specific ratio of what you

3    are supposed to have in the state of Kentucky?  No,

4    there's not.

5    Q.          What would you like to have?

6    A.          Well, you'd like to have as many as

7    possible; right?  But as far as -- as what?  Tell me

8    what -- what are you asking.

9    Q.          A PRD number, a per resident day number.

10   A.          Like for -- are you wanting me to give

11   you what I think would be a good PPD -- and actually --

12   actually I'm thinking -- I think over a 4.0 would be

13   good.  And I think that Brookdale was budgeted over

14   that.  I can't -- I don't remember what it was,

15   honestly don't.

16   Q.          So 4.0 hours of patient care per resident

17   day; is that right?

18                    MR. COCANOUGHER:  Object to form.

19   A.          Hands-on staff.

20   Q.          Yes.

21   A.          Yes.

22   Q.          That would be your RNs, LPNs, CNAs

23   combined; right?

24   A.          Yes.

25   Q.          Okay.  I think you'll -- you'll see in

                                                              47

1     the staffing ladders that your memory is correct.  I

2     think Brookdale was budgeted during your tenure at

3     somewhere between 4.0 and 4.3.

4              Are you aware of the five-star rating?

5     A.        Do I know what it is?

6     Q.        Yes.

7     A.        Yes, I do.

8     Q.        Let's explain for the record what is the

9     five-star rating system.

10    A.        The five-star rating system is a rating

11    system with CMS that rates nursing homes.  The first

12    number is your health inspections with the OIG, and

13    then it has your quality measures, it's got a staffing

14    number, and then your overall number.  But you start

15    out with the health inspections first.  So that gives

16    you that.  And of course, five is the top number.  One

17    would be the lowest number.

18    Q.        As the ED and administrator of Richmond

19    Place, did you strive for a high five-star rating?

20              MR. COCANOUGHER:  Object to form.

21    A.        I mean that number is -- I mean,

22    obviously, you -- you would want to have a -- you'd

23    want to have a high number.  But it's not always

24    reflective of the patient care that you give to

25    somebody.

                                                    48

1    Q.          You --

2    A.          You want to have a high number just

3    because that's the rating system.  But do I agree with

4    everything that the rating system personally?  No.

5    Q.          So the rating system is available to the

6    public; right?

7    A.          Yes, it is.

8    Q.          And the public uses it to compare nursing

9    homes; right?

10                  MR. COCANOUGHER:  Object to form.

11   A.          They can.

12   Q.          I mean, I think the program is called

13   Nursing Home Compare; right?

14   A.          You can go under Nursing Home Compare

15   under Medicare.gov and you can look up state

16   inspections.  And you can look up star rating systems.

17   I don't know if all of the public goes in and does

18   that, but you can do that.

19   Q.          And you know, as an administrator and as

20   a former ED, that that data submitted to Medicare has

21   to be accurate; right?

22                  MR. COCANOUGHER:  Object to form.

23   A.          Yes.

24   Q.          And if the data is not accurate that

25   could potentially be Medicare fraud; right?

49

1              MR. COCANOUGHER:  Object to form.

2    A.         Possibly.

3    Q.         Or even a crime; right?

4    A.         They get their information from -- the

5    health inspection parts is from the OIG and then I

6    guess assessments and stuff that are done.  Yeah, you

7    want them to be accurate the best that they can be.

8    Q.         Assessments and the staffing portion is

9    from the facility as well; right?

10   A.         Yeah, that's a portion of it as well.

11   Q.         The staffing portion is split into RNs

12   and then all care providers; do you recall that?

13   A.         Yes.

14   Q.         That staffing portion at the time that

15   you were an administrator of the building and an ED of

16   the building came from the CMS Form 671; do you recall

17   that?

18   A.         I know what a 671 is, yes.  I've never

19   filled out a 671 for Brookdale.  No, I have not.

20   Q.         The 671 is a document that the surveyors

21   give the administrator when they walk in the building;

22   right?

23   A.         On the annual survey, yes, it is.

24   Q.         And how does one fill one of those out?

25   A.         You take the payroll, okay, and fill out

50

1    the numbers with that from -- from, like, last two

2    weeks prior payroll.

3    Q.          So it's one full pay period; right?

4    A.          Yes.

5    Q.          And you are actually looking at the

6    payroll numbers themselves; is that correct?

7    A.          Yes, you should be, yeah.

8    Q.          At Brookdale was payday on a Friday?

9    A.          Yes, I believe so.

10   Q.          Okay.  How does -- when you were at

11   Brookdale was -- was the facility also communicating

12   PBJ data to CMS?

13   A.          Yes.

14   Q.          Okay.  For the sake of the record, let's

15   explain what PBJ data is.  What is it supposed to be?

16   A.          It is payroll based journal is what PBJ

17   stands for and it's information off the payroll.

18   Q.          What is the payroll system at Richmond

19   Place?

20   A.          Golly, I can't remember.  I'll be honest

21   with you.  I don't know.

22   Q.          Was it Kronos at the time that you were

23   there?  Kronos is mentioned on these staffing ladders,

24   that's why I'm asking.

25   A.          I don't know.

                                                        51

1    Q.          That's okay.  The PBJ data -- scratch

2    that.

3               When you were the administrator and the

4    ED, how did Brookdale make sure that contract work got

5    communicated up to CMS along with its PBJ data?

6                    MR. COCANOUGHER:  Object to form.

7    A.          Okay.  Are you asking when I was the

8    administrator -- say that again.  Sorry.

9    Q.          So PBJ data has got to contain both the

10   hours worked by employees and contractors; right?

11   A.          Correct.

12   Q.          It's my understanding, correct me if I'm

13   wrong, that the payroll system that you-all used

14   perhaps didn't capture contractor hours; is that

15   accurate?

16   A.          I don't believe that it did.

17   Q.          Right.

18   A.          They did not clock in and out, no.

19   Q.          There may have been some sort of, like,

20   contractor sign-in sheet I think is what I've heard.

21   A.          Correct.

22   Q.          So I'm trying to figure out what document

23   I can request, in the course of this litigation, that

24   is the PBJ data right before it gets sent to Medicare.

25   So what -- what did you-all do to your payroll data to

                                                          52

1    add those contractors back in before it went to CMS?

2    Do you understand where I'm trying to intercept the

3    data?

4    A.          Yes, I know what you are saying.  I did

5    not do that or take care of that so I would just be

6    guessing if I told you how it happened, how it worked.

7    Q.          Let me ask you this:  As the

8    administrator, was it someone at the facility level who

9    was doing that or above the facility level?

10   A.          I don't recall exactly who did it.

11   Q.          Okay.

12   A.          I honestly don't recall.  I mean,

13   ultimately, if it was -- I mean, it would have to come

14   from the facility first, I would think.  I would think.

15   But --

16   Q.          Yeah.

17   A.          -- I don't know.

18   Q.          Okay.

19   A.          I mean, we reported agency hours on a

20   daily basis when we used agency.

21   Q.          To whom?

22   A.          Or contract.  I mean, I reported it to

23   Cheryl Sarver.  Now, payroll probably reported it to

24   someone else in payroll.  I -- I don't remember.

25   Q.          So you did a daily report of agency hours

                                                           53

1    on up the chain?

2    A.            When we used agency, yes.

3    Q.            Okay.  Did that report, was that a

4    specific report that you used or would you just type a

5    quick e-mail, Hey this is how many hours we used today?

6    A.            Yeah, I think it was just maybe a quick

7    e-mail.  I don't think it was a specific report.  I --

8    I don't remember.

9    Q.            What was your -- I'm assuming that the

10   time that you were at Brookdale in any role you used

11   your professional e-mail to communicate with folks on

12   up the corporate chain and below you; right?  You

13   weren't using your personal e-mail?

14   A.            Correct.

15   Q.            What was your professional e-mail during

16   that time period?

17   A.            What was my e-mail address?

18   Q.            Yes.  Yes.  I've got to go search it in

19   the litigation so I got to know what -- what your user

20   name was.

21   A.            I don't -- I don't know.  I don't

22   remember what it was.

23   Q.            Okay.

24   A.            I mean, it was under Phillips.  I don't

25   know.  APhillips@Brookdale.com.  I can't remember

                                                            54

1    exactly what it was.

2    Q.          Okay.  On that CMS five-star rating, were

3    you ever told on a periodic basis what the facility's

4    five-star rating was?

5    A.          Yeah.  I can look that up just like

6    anybody else could.

7    Q.          On the Internet?

8    A.          Yeah.

9    Q.          I've also heard testimony about an e-mail

10   coming out periodically to inform the ED and

11   administrator and DON about the status of the five

12   star.  Do you recall those e-mails?

13                   MR. COCANOUGHER:  Object to form.

14   A.          Not specifically.  I don't -- I don't

15   recall that.

16   Q.          I've also heard testimony about meetings

17   where the five star was discussed periodically in the

18   context of QAPI meetings for the facility; do you

19   recall those?

20   A.          In the context of what?

21   Q.          Quality assurance meetings.  QAPI

22   meetings.

23   A.          Possibly.  I -- I don't recall anything

24   specific about -- about that.

25   Q.          Did you attend QAPI meetings rather?

                                                        55

1    A.            As the executive director or as the

2    administrator?

3    Q.            Yes.  Both.

4    A.            As the administrator, yes.  As the

5    executive director, I'm not sure.

6    Q.            What kinds of materials were kept as a

7    result of those meetings?

8    A.            I mean, generally, your QAPI meetings are

9    stuff that you are working on and you are talking about

10   things such as -- you are usually talking about data

11   from the previous month so you are looking at

12   infractions, you are looking at your quality measures,

13   you are looking at any PIPs that you may have going on,

14   PIPs as far as process improvement plans that you have

15   got going on, stuff that you are working on, that type

16   of thing.  You are probably going over falls, any

17   grievances or concerns.

18   Q.            And did -- my question is more about the

19   documentation of those meetings.  Like, were there

20   notes?  Were they saved in a binder?

21   A.            Yeah, there should be notes saved in a

22   binder for QAPI meeting minutes, yes.

23   Q.            Okay.  When you were the administrator

24   there were notes.  Were they kept on site?

25   A.            Yes.

1    Q.          Did you ever digitize them in any way?

2    A.          No.

3    Q.          Would you rely on --

4    A.          I mean, I don't think so.  Digitizing,

5    are you saying send them via e-mail to somebody?

6    Q.          Yeah.  Or maybe you have a repository or

7    a program or something on site that you put them in.  I

8    don't -- I don't.

9    A.          I don't know if that's something that

10   medical records did.  I mean possibly.  I don't -- I

11   don't recall that.  Me specifically, I don't recall

12   that.  I don't know.

13   Q.          Would you rely upon a director of nursing

14   to testify about how the actual electronic medical

15   record at Richmond Place worked?

16   A.          What do you mean "rely" on them to

17   testify -- what do you -- what --

18   Q.          I have some questions about how the

19   electronic medical record worked and I'm wondering if I

20   need to ask you those or you -- I should just direct

21   those to the director of nursing?

22   A.          It would be more the director of nursing,

23   yes.

24   Q.          Would you rely upon the director of

25   nursing to -- to tell me how the back end auditing

                                                          57

1    function of those medical records work or would you

2    have any information on that?

3                      MR. COCANOUGHER:  Object to form.

4    A.          The director of nursing.

5    Q.          Would you rely upon your director of

6    nursing to -- to testify about what clinical

7    documentation and assessments should be in a patient

8    chart or do you have any information about that?

9                      MR. COCANOUGHER:  Object to form.

10   A.          I would know some of them, yes.  But I

11   would say that they're more of the expert on those.

12   Q.          Okay.  Did you look at your staffing, as

13   either the executive director or the administrator, on

14   a monthly basis to determine if you were over or under

15   budget?

16   A.          I don't recall specifically any

17   instances, but with the financial statements, you know,

18   labor is a big piece of that.  So I would look at it,

19   I'm -- I'm sure.

20   Q.          And would you look at labor reports

21   periodically as well to determine whether, for

22   instance, you were having a lot of overtime?

23   A.          Yes.

24   Q.          At Richmond Place what were those

25   documents colloquially called so I can go request them?

                                                        58

1    A.          I don't -- I don't -- I don't remember
2    what they were called.
3    Q.          I want to make sure that I have access to
4    whatever you were looking at.  And so the director of
5    nursing said that she had seen these staffing ladders
6    and I have taken an administrator before that said she
7    saw those, but you are saying that you had access to a
8    different form; is that correct?
9                    MR. COCANOUGHER:  Object to form.
10   A.          I don't know what the form was.  When
11   you're -- when I'm talking about monthly financial
12   statements, that's not the same thing when I'm talking
13   about that.  I don't recall what the form was honestly.
14   I don't.
15   Q.          So there were monthly financial
16   statements, I've got that.  Was there any monthly
17   staffing or overtime reports?
18   A.          I don't remember if it was monthly -- I
19   don't remember if there was monthly ones.  I know that
20   on -- I'm pretty sure that it was a weekly basis that
21   we would look at the payroll on a weekly basis to see
22   with overtime at that point in time.  Every week we
23   would look at that and we would explain, if we had ten
24   hours or more overtime, we would have to explain why we
25   had ten or more hours overtime.

59

1    Q.          And whatever you are looking at on a

2    weekly basis is different than this form I've got in

3    front of you right here -- you may want to look at one.

4    A.          I mean this is 2014.

5    Q.          I was going to say you may want to look

6    at one from your tenure.  So if you -- if you flip on

7    down, it's all of them through 2018.  So for instance,

8    I've got one -- so those little numbers at the bottom

9    are called Bates numbers, so you can look at February

10   of 2018, that's Johnson 425, for instance, that would

11   have been during your tenure; right?

12   A.          February of 2018.  Yes.  Yeah.

13               So, where -- I'm sorry, where is 2018

14   here because this is 2014?

15   Q.          So these are Bates numbers, so throughout

16   the deposition today, I'm going to be referring to

17   these Bates numbers, and they run sequentially, so if

18   you can find 425.

19   A.          Okay.

20   Q.          All right.  So this would have been

21   during your tenure and my question was just simply

22   whether the forms or information that you looked at to

23   determine your staffing on a monthly basis was

24   something other than these staffing ladders?

25                       MR. COCANOUGHER:  Object to form.

                                                         60

MODERN SCRIBE - susan@modernscribe.net

1    A.            There may have been something else in
2    addition to this.  I don't recall exactly.
3    Q.            Does this look familiar at all, the form
4    itself?
5    A.            I don't know.  I'd probably need to put
6    my glasses on because this is really hard to read, and
7    I'm sure I didn't have it printed out like this.  It
8    was probably on the computer so it probably looked a
9    little bit different than this.
10   Q.            Sure.
11   A.            So -- can I see.  I don't have my glasses
12   in here.
13   Q.            Would you -- we can take a break if you
14   want to go get them.  We've been doing for an hour and
15   a half.  That will work?
16   A.            Let me see if I can see a little bit
17   better.  That's a little bit better but it's still not
18   great.
19                 So is there another report?  You are
20   asking me that?  Possibly.  I don't -- I don't recall
21   what the name of it was, if there was another report
22   that I looked at.  As far as does this look familiar to
23   me?  I don't know.  I don't know.  I don't recall.
24   Q.            So one of the questions that I have
25   regarding this form is on all of these forms there is a

63                                                           61

1    total budget PRD.  And if you look -- do you see right

2    in the middle of the page there it says:  Direct care

3    PRD calculations.  In that gray stripe?

4    A.          Yes.

5    Q.          Okay.  So the line below it says:

6    Physical census.

7                Are you with me?

8    A.          Yes.

9    Q.          And then all of the way down on that

10   little next section there are a bunch of lines RN

11   budget, PRD, LPN budget, PRD.

12               Do you see all those?

13   A.          Uh-huh (affirmative.)

14   Q.          And then total budget PRD at the very end

15   of that block.  I am wondering who and where and how

16   the company came up with these budget PRDs.  And I'm

17   wondering if you know.

18               MR. COCANOUGHER:  Object to form.

19   A.          No, I don't know.

20   Q.          And do you know who I would ask?

21   A.          No, I don't offhand.  No.

22   Q.          Okay.  Do you know if the PRD, the RN

23   budget PRD, LPN, CNA/CMA was facility specific or was

24   that companywide?

25   A.          I don't know if it was companywide or

1   not.

2   Q.          But you had a way to look at your

3   staffing numbers monthly; it wasn't this form it was

4   some other way; right?

5   A.          We could look at our staffing numbers

6   but -- but I mean, I feel like what you are asking me

7   is would I rather put an LPN in there than an RN, and I

8   just want to get a nurse to take care of the -- the

9   patient.  So it makes -- it didn't make a difference.

10  We want to get somebody to take care of the patient.

11  Q.          I wasn't asking you that.

12  A.          Okay.

13  Q.          I was just trying to figure out -- I -- I

14  was trying to make sure that you had access to your

15  staffing numbers on a monthly basis.

16  A.          Okay.

17  Q.          Accurate numbers.  You had access to

18  that; right?

19  A.          Yes, I believe I did.

20  Q.          You knew -- you knew what your numbers

21  were; right?

22  A.          Yes.

23              MS. PARKER:  Okay.  Okay.  Let's go

24              ahead and go off for five minutes.  We've

25              been going for a little bit.

                                                        63

1        VIDEOGRAPHER:  We're off the record.

2        (Off-the-record discussion held.)

3        VIDEOGRAPHER:  We're back on the

4   record.

5   Q.        Was there a bonus system in place at

6   Richmond Place?

7   A.        Yes.

8   Q.        What was the bonus system?

9   A.        It was kind of complicated.  I -- I don't

10  even -- I don't even know really exactly what all it

11  was.  Now are you asking as executive director or are

12  you asking as the administrator -- which one are you

13  asking about?

14  Q.        Let's start with the executive director.

15  A.        Okay.  I don't remember what the criteria

16  is.  My thing has always been I'm going to do the best

17  I can do in any job that I have and that a bonus is

18  simply a bonus if you get it.  But I'm going to do what

19  I need to do anyway besides that.  I don't remember

20  what all of the criteria was.  Just a couple of things,

21  you know, obviously offhand would be financials would

22  be one.  Satisfaction surveys, resident satisfaction

23  surveys was like the huge driving factor of -- of -- of

24  the bonus piece.  And that is -- that's -- and then

25  survey was in -- tied into that as well.

1    Q.          Were the -- was the -- was the bonus
2    criteria written down in any way?
3    A.          I'm sure it was somewhere but I -- I -- I
4    don't -- I don't know.  I don't have it.  I --
5    Q.          Sure.
6    A.          I -- I mean --
7    Q.          Didn't expect to need it.
8    A.          I don't -- I didn't even understand it
9    all when I got it, to be honest with you.
10   Q.          The financials piece, was that for good
11   financial stewardship like for coming under budget?
12   A.          Yes, it would be meeting -- meeting, you
13   know, budget, that would be -- a lot of that had to do
14   with census with sales, with the IL.
15   Q.          Now, as an administrator, was that
16   budget -- that bonus process different?
17   A.          It was different in -- in -- in the fact
18   that, you know, you are not over all of those -- the
19   other buildings and things like that.  And then as
20   executive director, I also had personalized living that
21   I took care of too and that's where they have
22   additional services and stuff like that that they would
23   provide to people in IL.  It was kind of like a
24   separate company all on its own.  I didn't get a bonus
25   there as the administrator.  When I got a bonus, my

                                                          65

1    bonus was when I was the executive director.

2    Q.          What years did you receive a bonus as the

3    executive director?

4    A.          I received a bonus in 20 -- in 2018.  And

5    I may have gotten something small -- I can't remember,

6    in 2017, just depending on when I had started as the

7    executive director, both of those being as executive

8    director.

9    Q.          When you received that bonus, was that

10   split up over monthly checks or was it one lump bonus

11   check?

12   A.          It was one.

13   Q.          Are you familiar with a program called

14   CMIP?

15   A.          No.

16   Q.          Okay.  Have you ever heard of the CMIP

17   bonus program?

18   A.          What?  Say that again.

19   Q.          There's a notations in the financials

20   about a CMIP bonus, C-M-I-P, bonus.  And then there's

21   also notations in the financials about a bonus bonus,

22   so it appears that there are two -- two different

23   categories of bonuses.

24   A.          C-M-I-P?

25   Q.          Yes, ma'am.

66

1    A.          And that may stand for something.

2    Q.          It may.

3    A.          Okay.  CMIP -- CMIP like you are saying

4    doesn't sound familiar, but CMIP sounds familiar to me.

5    Q.          Okay.

6    A.          But I don't know what it stands for.

7    Q.          Like your bonuses were not called CMIP,

8    were they?

9    A.          I don't recall what it was.

10   Q.          Okay.  Can you think of any reason why,

11   on a monthly basis, money would be coming out of your

12   facility earmarked for a CMIP bonus?

13                    MR. COCANOUGHER:  Object to form.

14   A.          I am --

15   Q.          Can you think of any reason -- were you

16   aware at your facility that money was coming out of the

17   facility accounts on a monthly basis for somebody's

18   CMIP bonus?

19                    MR. COCANOUGHER:  Object to form.

20   Q.          Like $23,000.

21   A.          A month?

22   Q.          Yeah.

23   A.          Okay.  Are you talking about for the

24   nursing home or are you talking about for IL, PC, and

25   memory care?

                                                    67

1    Q.          Well, I'm talking about the nursing home
2    financials.  Were you aware that -- that money was
3    coming out of that account in that way?
4                     MR. COCANOUGHER:  Object to form.
5    A.          No.
6    Q.          Does that --
7    A.          $23,000 a year?  A month?
8    Q.          A month.
9    A.          A month.  $23,000 a month?  No.
10   Q.          Would that surprise you?
11   A.          I don't know what that is.  I mean, I
12   don't know.  Yeah, I'm kind of surprised.  I don't
13   know -- I don't really know what you are talking about.
14   Q.          Were you given access to the general
15   ledger when you were either the ED or the nursing home
16   administrator?
17   A.          I would think so but I don't recall.
18   Q.          You don't recall reviewing those?
19   A.          (The witness shakes head negatively.)
20   Q.          Remind me what year you started working
21   at Richmond Place again.
22   A.          I worked there as the ED in 2016.
23   Q.          That's right.  That's right.  So you
24   had -- did you have any crossover with Benita
25   Dickenson?

                                                        68

1    A.            No, I did not work with Benita Dickenson.

2    Q.            So would it surprise to know that on the

3    2016 balance sheets on the general ledgers for the end

4    of the year there was $112 million dollar account that

5    was due to another Brookdale affiliated entity?

6                       MR. COCANOUGHER:  Object to form.

7    A.            On the nursing home financials?

8    Q.            Correct.

9    A.            Okay.

10   Q.            I mean, were you aware, as the executive

11   director and as the administrator, that Richmond Place

12   owed a hundred million dollars to other Brookdale

13   entities?

14                      MR. COCANOUGHER:  Object to form.

15   A.            I don't recall that.

16   Q.            Does that surprise you?

17   A.            Yeah.  I -- I don't recall that.  And I

18   don't get into the -- I had nothing to do with the cost

19   report or anything like that.  I don't -- I don't know.

20   Q.            Or the general ledger in any way?

21   A.            I don't know if I saw the general ledger.

22   In some places the general ledger comes out with the

23   financials on a monthly basis.  But I -- I don't know.

24   I don't know if that's -- I don't know what -- I don't

25   know what you are referring to.

1    Q.         Well, and -- and part of your bonus which
2    you received in 2016 and 2017 -- 2017 and 2018 was --
3    was for financial -- part of that was for financial
4    stewardship; right?  I mean, you testified to that a
5    minute ago?
6    A.         Yeah.
7    Q.         So but you -- you were not aware of this
8    one hundred million outstanding debt; right?
9              MR. COCANOUGHER:  Object -- object to
10             form.
11   A.         I don't recall that.
12   Q.         That would probably be something you'd
13   remember; right?
14   A.         I would think so.  I don't know.
15   Q.         Yeah.  And I'll show it to you in a
16   minute.  But --
17   A.         But when was this?  It was in 2016.
18   Q.         It carries so the debt continues to carry
19   through 2016, '17 and '18 on the financials.  What I
20   have in this stack are the 2016 ones, but I have the --
21   the other ones my computer you are welcome to see.  But
22   it's -- it's over a hundred million dollars that keeps
23   carrying as a debt.  And I'm wondering -- it sounds
24   like as the executive director and the administrator
25   you were not aware of that hundred million dollar debt?

1               MR. COCANOUGHER:  Object to form.

2   A.          Right.  Correct.

3   Q.          Right.  Okay.  And you were not aware of

4   the CMIP money coming out of the account as well?

5   A.          I don't recall that.  I don't recall it.

6   Q.          Do you recall treasury journal payments

7   of upwards of $500,000 a month coming out of the

8   account to other Brookdale entities?

9               MR. COCANOUGHER:  Object to form.

10  A.          No, I don't recall that.

11  Q.          Are you familiar with the treasury

12  journal account?

13  A.          No.

14  Q.          Have you ever heard of that before?

15  A.          I don't recall hearing that word.

16  Q.          Okay.  The facility has to do an accurate

17  assessment on each resident; correct?

18              MR. COCANOUGHER:  Object to form.

19  A.          Yes.

20  Q.          And by "facility," I mean, of course,

21  Richmond Place, the skilled nursing facility.

22  A.          Okay.

23  Q.          That assessment needs to change with the

24  resident needs; right?

25              MR. COCANOUGHER:  Object to form.

71

1    A.          What did you -- I'm sorry.  What do you
2    -- what?
3    Q.          Would you agree with me that the
4    assessment has to change as the needs of the resident
5    changes?
6    A.          I mean, if there's a significant change,
7    they need to do another assessment.  If there's a
8    significant change.
9    Q.          And Brookdale completed minimum data sets
10   on all of its residents; correct?
11   A.          Yes, they did.
12   Q.          And those minimum data sets were
13   communicated to CMS; right?
14   A.          Yes.  They should have been, yes.
15   Q.          At the end of the min- -- minimum data
16   sets, each Brookdale resident was assigned a RUG score;
17   right?
18   A.          Yes.
19   Q.          And can you explain a little for the jury
20   what a RUG score is.
21              I say for the jury, we've obviously not
22   got a jury --
23   A.          Okay.
24   Q.          -- but at some point, this may be played
25   for a jury so if you will explain what a RUG score is.

72

1      A.          Basically what -- what the RUG score is

2      it depends on the acuity of the patient and there's

3      different scores.  Depends on if they're -- let's say,

4      rehab and how often they get rehab and, just depends on

5      just whatever that assessment you put in all of the

6      information about that person and then it gives them a

7      certain RUG score and that is a rate that we're paid

8      for.

9      Q.          So the more care somebody needs based on

10     their RUG score the more pay -- the more Richmond Place

11     gets paid for taking care of that resident; right?

12                      MR. COCANOUGHER:  Object to form.

13     A.          Yeah.  Sometimes, though, it doesn't

14     always make sense.  Sometimes they -- you could get

15     paid more for a therapy RUG score versus a clinically

16     complex -- somebody that would seemingly have more

17     nursing time.

18     Q.          The regulations require the completion of

19     those MDSs; right?

20     A.          Yes, you are supposed to complete the

21     MDS, yes.

22     Q.          I'm talking about the federal

23     regulations.

24     A.          Yes.

25     Q.          The federal reg- -- regulations are the

                                                                73

1    standard of care; right?

2                      MR. COCANOUGHER:  Object to form.

3    A.            The federal regulations are what we need

4    to -- I don't know.  I don't -- what do you mean by

5    "standard of care"?

6    Q.            What you want all of your staff to follow

7    in order to do a good job is what I mean.

8                      MR. COCANOUGHER:  Object to form.

9    Q.            That's what I mean.

10                     MR. COCANOUGHER:  Object to form.

11   A.            Yes, we -- we want to try to follow the

12   regulations.

13   Q.            The state regulations are also the

14   standard of care; right?

15                     MR. COCANOUGHER:  Object to form.

16   A.            I don't know if they're the standard of

17   care, but the state regulations we want to try to

18   follow the state regulations just like we would the

19   federal regulations, yes.

20   Q.            This might help because standard of care

21   is sometimes a term that folks get stuck on.

22                 Why don't you go to tab -- let me see

23   your binder real quick.  Tab 13 has a survey that I

24   think you signed.  That's your signature; right?

25   A.            Yes, it is.

                                                          74

1    Q.          As the administrator for this building;
2    correct?
3    A.          Yes.
4    Q.          And while we're just on these surveys,
5    will you agree with me that the plan of correction has
6    to contain all of the interventions that the nursing
7    home is going to undertake to fix the tag on a survey;
8    right?
9                     MR. COCANOUGHER:  Object to form.
10   A.          Yes, we put in -- we put in our
11   intervention, yes.
12   Q.          That's the point of the plan of
13   correction; right?
14   A.          Uh-huh (affirmative.)
15   Q.          It is to communicate to the State how you
16   are going to fix it; right?
17   A.          Uh-huh (affirmative.)
18   Q.          So this survey on the bottom, it has
19   little page numbers so I am going to be looking at Page
20   10 of this survey that you signed.  And I'm at the
21   bottom of that page.  It says -- talking about care
22   provided in nursing homes:  These variables include
23   one -- do you see that?
24   A.          I'm sorry.  Where are you?
25   Q.          Very, very bottom line.  Second to last

                                                        75

1    line says:  These variables --

2    A.            Okay.  Uh-huh (affirmative.)

3    Q.            -- include, one, the nurse's own

4    qualifications, two, on the next page, the standard of

5    care which would be provided in similar circumstances

6    by reasonable and prudent nurses who have similar

7    training or experience.

8                  So that's what I'm talking about today

9    when I'm talking about standard of care.  This -- this

10   definition that was used in the document that you

11   signed.  Do you understand what the statement by

12   standard of care in that situation?

13                  MR. COCANOUGHER:  Object to form.

14   A.            Yeah, I think they were thinking nursing

15   standard of care on this one.

16   Q.            Yeah.

17   A.            Yeah.

18   Q.            Yeah, so we can -- we can talk about

19   standard of care today and you will know what I'm

20   talking about?

21                  MR. COCANOUGHER:  Object to form.

22   A.            Okay.

23   Q.            You want all of your staff to follow

24   these state and federal regulations; correct?

25   A.            Oh, yeah, as much as possible.

76

1    Q.            If they don't follow those state and
2    federal regulations, they could be subjected to
3    disciplinary action; right?
4    A.            Potentially, yes.
5    Q.            Up to and including termination; right?
6    A.            Potentially depends on, you know, maybe
7    the seriousness of it, yes.
8    Q.            Are you aware that CMS puts out an
9    expected staffing number for Richmond Place and for
10   every other nursing home in the country that takes
11   Medicare and Medicaid?
12                 MR. COCANOUGHER:  Object to form.
13   A.            No, I'm not aware of expected staffing
14   number.
15   Q.            You never received any notice of an
16   expected staffing number during your time as an
17   administrator?
18   A.            Expected staffing number?  Not that I
19   recall.  A -- a specific number, a ratio number?
20   Q.            Yeah, it's called the CMS expected
21   staffing number.  It's communicated to nursing home
22   administrators quarterly.
23                 MR. COCANOUGHER:  Object to form.
24   Q.            As -- as part of that five-star data?
25                 MR. COCANOUGHER:  Object to form.

77

1    Q.          Do you recall that at all?

2    A.          The five-star may be depending on what --

3    what that staffing -- okay.  All right.

4    Q.          Do you know what I'm talking about now?

5    A.          Yes.  Sorry.

6    Q.          Okay.  Do you recall what that expected

7    staffing number was for Brookdale during your tenure as

8    administrator?

9                MR. COCANOUGHER:  Object to form.

10   A.          No, I do not.

11   Q.          Do you recall what that number was for

12   Brookdale during your tenure as executive director?

13   A.          No, I don't offhand, no.

14   Q.          Was Brookdale always compliant with CMS's

15   regulations with respect to the expected staffing

16   number?

17               MR. COCANOUGHER:  Object to form.

18   A.          I don't recall.

19   Q.          Should Brookdale have always been

20   compliant with that number?

21               MR. COCANOUGHER:  Object to form.

22   A.          That's definitely what you want to do.

23   That's your goal.

24   Q.          When Richmond Place provided staffing

25   data to med- -- to Medicare, the CMS 671 form, we -- we

78

1    talked about that earlier and you and I both agreed
2    that that data had to be accurate; right?
3                        MR. COCANOUGHER:  Object to form.
4    A.          Yes, it's off of payroll.  You want it to
5    be accurate.
6    Q.          Did you ever inform anybody at Medicare
7    that Brookdale was no longer staffing its home
8    consistent with the numbers it submitted to the federal
9    government?
10                       MR. COCANOUGHER:  Object to form.
11   A.          No.
12   Q.          Did you ever inform the public, by any
13   means, that Brookdale was no longer staffing its home
14   consistent with the numbers it gave to the federal
15   government?
16                       MR. COCANOUGHER:  Object to form.
17   A.          No.  I never filled out a 671 form when I
18   was there.
19                       Is that what you are asking me?
20   Q.          I'm asking if you put anybody on notice
21   that -- that Brookdale wasn't staffing to the level
22   that it said it was staffing to on the 671?
23                       MR. COCANOUGHER:  Object to form.
24   A.          No.  I don't recall Brookdale having any
25   issues with staffing when I was there as far as

1    regulatory issues with staffing.

2    Q.          Because it should staff the home

3    consistent with the data that it provides on the 671

4    form; right?

5                    MR. COCANOUGHER:  Object to form.

6    A.          It's taken off the payroll so it should,

7    yeah.  I didn't fill out a 671 form when I was at

8    Brookdale.

9    Q.          Right.  But you received quarterly notice

10   of the star rating; right?

11                   MR. COCANOUGHER:  Object to form.

12   A.          I was there for six months as the

13   administrator.  I don't -- I don't recall -- I don't

14   recall that.

15   Q.          And you received monthly notice of your

16   staffing numbers; right?

17                   MR. COCANOUGHER:  Object to form.

18   A.          I'm sure there was a report with that.

19   Q.          Did Brookdale staff to census?

20   A.          I mean, I -- I -- I believe so.  The

21   thing that I looked at the most was the daily staffing

22   and how many -- you know, how many people we had on

23   there and how many we wanted to make sure that we've

24   got because, just like anyplace else, like I told you,

25   we struggled with call ins, just like anyplace else.

80

1    With staff, we offered bonuses, we offered overtime to

2    get people to come in there.  We had people that stayed

3    over.  We had salary people that stayed over.  We did

4    everything we could to staff the building.

5    Q.          Are you talking about the daily staffing

6    sheets when you say --

7    A.          Yes.

8    Q.          Okay.  Those are the ones that have to be

9    posted by State regulation; right?

10   A.          Yes.

11   Q.          They were posted near the door at

12   Richmond Place; right?

13   A.          If I recall the -- if I recall, they were

14   posted across from the nurses' station when I was there

15   as the administrator.

16   Q.          Okay.  And those staffing sheets are

17   posted so that the members of the public can see them;

18   correct?

19                    MR. COCANOUGHER:  Object to form.

20   A.          They can see them, yes.

21   Q.          And you know that members of the public

22   may be relying on the accuracy of those -- those --

23   that staffing information; right?

24                    MR. COCANOUGHER:  Object to form.

25   A.          Yes.

81

1    Q.          So they should also be correct and

2    accurately reflect how many people are going to be in

3    the building that day; right?

4                    MR. COCANOUGHER:  Object to form.

5    A.          You put down how many people are on the

6    schedule and then, if people call in, you take them off

7    and you correct it.

8    Q.          Right.  So it's accurate?

9    A.          Yes.

10   Q.          The RUG scores that you were talking

11   about earlier, a portion of that payment reflects the

12   amount of direct care a patient needs; right?

13   A.          Yes.

14   Q.          Do you know, off the top of your head,

15   what percentage or what values per RUG payment goes --

16   is supposed to go to direct care versus other things?

17   A.          No, I don't know off the top of my head,

18   no.

19   Q.          Does it vary by RUG or is it consistent

20   across all RUGs; do you know?

21   A.          I'm not sure.

22   Q.          How does -- what are the -- what is the

23   paperwork that gets generated when Richmond Place gets

24   paid for caring for a resident?  Like specifically, I

25   have some resident bills, but I know you-all must send

                                                            82

1    paperwork to Medicare as well; right?

2    A.          Right.  They submit -- they submit MDS

3    that we talked about.

4    Q.          Do they submit any universal billing form

5    like a U -- UO4 form or anything like that?

6    A.          I don't know if that's what it's called

7    but I think so.

8    Q.          Some sort of bill -- you-all submit some

9    sort of bill to Medicare?

10   A.          I think so.  I'm not sure.

11   Q.          I'll show you what I've gotten as

12   Ms. Johnson's bills.  Try Tab 7 in that binder.  See

13   how good my tab making skills were this morning.  Yes.

14   Okay.  This is what I have gotten as Ms. Johnson's

15   bills.

16   A.          Okay.

17   Q.          It looks like this is the room and board

18   charge that -- that Ms. Johnson was assessed.  I'm

19   wondering if there may be additional bills that were

20   sent directly to Medicare for payment.

21   A.          I don't know.

22   Q.          Okay.  Who would I ask over at Richmond

23   Place?  Like what role would I ask at Richmond Place to

24   determine that, whether there's any other bills?

25   A.          I would say probably the business office

1    manager.  But I don't believe that the business office

2    manager billed Medicare.  I think that was billed

3    from -- I think that was billed from a corporate person

4    for Medicare billing.

5    Q.          Same with Medicaid, would that have been

6    corporate?

7    A.          The Medicaid -- if I recall correctly, I

8    think that was billed at the facility level, and I

9    think the Medicare was billed at a corporate level.

10   Q.          Okay.

11   A.          Not a hundred percent but I -- I think

12   that.

13   Q.          Do you happen to know which department at

14   the corporate level would have dealt with that billing

15   or financials?

16   A.          I would say some billing or accounts

17   receivable department within the corporate.

18   Q.          Okay.  So while we are looking at

19   financials, I just want to show you the cost reports

20   which is going to be behind tab -- try 14.  These don't

21   look familiar; right?  Yeah, that's the new stuff,

22   yeah.

23   A.          The one that has got Christian.  Make

24   sure I'm looking at the right thing.  Somebody's

25   signature?

84

1    Q.          Yes.

2    A.          Okay.  No.

3    Q.          You didn't have any --

4    A.          I -- I didn't fill out the cost report.

5    Q.          Okay.  That's fine.  I just want to make

6    sure while you are looking at it so I know we don't

7    have to ask any more questions.

8    A.          That's above me.  I'm not sure.

9    Q.          Do you know who above you would have done

10   that?

11   A.          I guess this person's name right here

12   maybe.

13   Q.          But you don't know what department

14   perhaps would have handled that at Brookdale?

15   A.          Not offhand, no.

16   Q.          Did you ever receive copies of it at all,

17   the cost report?

18   A.          Cost report?

19   Q.          Yes.

20   A.          I could have possibly.  It's hard to

21   understand, though.  It's kind of over me.

22   Q.          How about the Medicaid cost report, did

23   you have any role in that one?  This one is Medicare.

24   A.          I don't believe so.

25   Q.          Did you ever receive a copy of the

1    Medicaid cost report?

2    A.          I could have gotten a copy of it.

3    Q.          When you were talking to me earlier about

4    4.0 PRD being a pretty good number, do you have any

5    sense of what you would like that number split into for

6    RN, LPNs, and CNAs?

7                        MR. COCANOUGHER:  Object to form.

8    A.          I mean, as far as I don't know what the

9    breakdown needs to be, to be honest with you, offhand.

10   As far as, you know, RN and LPNs go, like I said, it

11   just -- LPNs mainly worked the floor in nursing homes.

12   RNs mainly work in the supervisory positions or

13   management positions.

14   Q.          So you don't have a breakdown of RNs

15   sitting here today that you would feel comfortable

16   with?

17   A.          Well, the regulatory requirement, like I

18   said, is eight hours a day is what you want.  You want

19   an RN in there eight hours a day.  Generally, we had

20   that and more.  It would be nice to have 24 hours a

21   day.  That would -- that would be good to have.  But,

22   you know, we always met the regulatory requirement and

23   went beyond that as far as the eight hours.

24   Q.          Okay.  So am I to take it from your

25   testimony that whatever the regulatory requirement said

1    was supposed to be Brookdale's expected staffing is

2    what you-all met?

3                     MR. COCANOUGHER:  Object to form.

4    A.          So are you asking me that -- did we have

5    eight-hour RNs the entire -- every day; is that what

6    you are asking me?

7    Q.          Well, I'm asking if you followed the

8    regulations?

9    A.          As far as I know that we did follow the

10   regulations with the eight-hour RN requirement every

11   day as far as I know.

12   Q.          And if you hadn't done that with the

13   eight-hour RN requirement every day, that would be a

14   breach of the standard of care; wouldn't it?

15                    MR. COCANOUGHER:  Object to form.

16   A.          It would not be following the

17   regulations.

18   Q.          Which could put patients at risk; right?

19                    MR. COCANOUGHER:  Object to form.

20   A.          Per what the regulations are.

21   Q.          Okay.  Let's look at the financials real

22   quick.  Those are going to be in your new packet --

23   A.          Was there an issue with -- with that?

24   I'm just asking you.  In the three weeks that this lady

25   was there, was there an issue with us not having RN

                                                        87

1    coverage eight hours in the three weeks?  I'm -- I'm

2    not aware of it.  I'm just asking.

3    Q.        So I can't answer your questions today.

4    A.        Okay.

5    Q.        And I can't actually talk to you off the

6    record.  So --

7    A.        Okay.

8    Q.        Do you recall there being an issue --

9    A.        Sorry I'm asking her questions.  Sorry.

10             No, I do not recall there being an issue.

11   That's why -- I'm sorry.  I'm asking you.

12   Q.        No, and I'm not trying to be rude, but I

13   can't --

14   A.        Sure.

15   Q.        -- answer those.

16   A.        Okay.

17   Q.        I will -- we'll -- we'll talk a little

18   bit later.

19             But let's look at the financials for

20   right now which are going to be the tab right after the

21   cost report, which is 15.

22             Are you there?

23   A.        Yeah.

24   Q.        I'm going to be looking on Page 90, which

25   is the second page in that stack.  It's C. Johnson 550;

1    are you there with me?

2    A.          Okay.

3    Q.          At the very bottom there are bunch of

4    accounts called cash operating accounts.  Do you see

5    that?

6    A.          Uh-huh (affirmative.)

7    Q.          What was the operating account?

8    A.          I don't recall.  I don't know if that's

9    petty cash.  I'm not sure what -- what that is or

10   just...

11   Q.          Did you move any money from the operating

12   account?

13   A.          Me myself?  No.

14   Q.          So you, as the administrator, would never

15   have moved any money from the operating account; is

16   that correct?

17   A.          Moved it?

18   Q.          Anywhere.

19   A.          No.

20   Q.          Okay.  Go on to Page 92.  What's the AR

21   clash -- or cash clearing account.

22   A.          I'm not sure.

23   Q.          Did you ever remove any money to or from

24   the AR cash clearing account?

25   A.          I'm not sure what the AR cash clearing

1    account is, so therefore, I don't believe so.  I don't

2    know.

3    Q.          Were you responsible for moving any money

4    into different segregated areas of the -- of the

5    company at any time?  Like did you have access to a

6    bank account where you could move money?

7    A.          No.

8    Q.          Okay.  So all of this movement of money

9    was happening -- to the extent that money was moving

10   out of the cash clearing accounts and out of the AR

11   accounts, during your tenure as administrator or

12   executive director, that was happening without your

13   involvement; is that fair?

14                    MR. COCANOUGHER:  Object to the form.

15   A.          I would -- yeah, I would say probably so.

16   I don't -- I don't recall that.  I mean, would

17   we -- like, if we got a bill would we put it in a

18   certain account, like this came out of this account,

19   and this came out of this account, yes.  But physically

20   moving money, I -- I'm not sure.

21   Q.          Like what kind of bills would you

22   segregate that way?

23   A.          Like if we had a receipt for ice cream

24   for an activity, is that what you are saying?  So it

25   may be put into activities versus raw food.

                                                      90

1    Q.          Would that be something that you would
2    actually keystroke into a program, like a bill for time
3    program --
4    A.          That would --
5    Q.          -- or a QuickBooks program?
6    A.          That would generally be like the accounts
7    payable person that -- that would do that.
8    Q.          All right.  Let's go on to Page 94.  And
9    I'll represent to you that throughout the ledger we get
10   a lot of charges into and out of the due to/from
11   affiliates column.  And so I'm wondering if you, as the
12   administrator or executive director, moved any money
13   into or out of the due to/from affiliates column?
14   A.          I don't know what the due to/from
15   affiliates means.  I mean, I see this right here where
16   it talks about direct supply and that's like a medical
17   supply place.
18   Q.          Yeah.  I'm not really worried about that
19   one.  I'm worried about -- so if you count up from the
20   bottom, one, two, three, four, the due to/from
21   affiliates column that is affiliated with these
22   treasury journals, where it does not have a voucher
23   line description and this one is, for instance,
24   $90,000, that's -- that's what I'm wondering if you, as
25   an administrator or an executive director, had any role

                                                      91

1   in moving money into or out of the due to/from

2   affiliates column associated with a treasury journal

3   description?

4   A.          I'm not sure what the treasury journal

5   is.  It may be somebody in accounts payable or in the

6   business office could -- could speak to that.  I don't

7   know if this is a Medicaid payment, a Medicare payment

8   or -- I don't know what it is.

9   Q.          So you did not do that is what I'm

10  saying?

11  A.          I don't believe that I did.

12  Q.          Okay.  All right.  Next tab, Tab 15.

13  A.          I'm on 15.

14  Q.          I'm sorry.  Tab 16, whatever the next tab

15  is.

16  A.          I'm sorry.

17  Q.          No worries.  Have you ever seen this

18  document before?

19              MR. PARKER:  This is a working trial

20              balance, Matt, if you are there.

21  A.          I just don't remember these with the

22  nursing home, but there's a, I mean, possibility I've

23  seen trial balances before.  I don't know if it was

24  Richmond Place or somewhere else.  I'm not really sure.

25  Q.          Okay.  This -- this one was 12/31/2016.

                                                        92

1    That would have been during the time -- the ending year

2    where you were executive director; right?

3    A.          Yes.

4    Q.          On the description column, if you will

5    count one, two, three, four, five, six, seven, eight,

6    nine, ten, 11, 12 down.  We get the due to/from

7    affiliates column there.

8                Do you see that?

9    A.          Yeah, the $123,000 -- I don't know what

10   that is.

11   Q.          123 million; right?

12   A.          Okay.  123 million.  I don't know what

13   that is.

14   Q.          Nothing about this is jogging your

15   memory?

16   A.          No.

17   Q.          And -- and am I the first one to tell

18   you, sitting here today, that Richmond Place was

19   carrying $123 million dollar negative due to/from

20   affiliates account --

21                    MR. COCANOUGHER:  Object to form.

22   Q.          -- during your tenure?

23   A.          I'm not aware of what that is.  I don't

24   understand what it is.

25   Q.          All right.  Next financial tab.

93

1          You should be looking at a score card for

2   CCRC Rental.  Are we both looking at the same thing?

3   A.          Yes.

4   Q.          Let's go up to your years, the first two

5   is '14/'15 so let's look at '16.  What does NLI stand

6   for?

7   A.          Golly, I forgot.

8   Q.          Now I've forgotten.

9   A.          I forgot what it is.  Seriously.  I -- I

10  may think about it here in a minute but...

11          MR. COCANOUGHER:  Is it net operating

12          income?

13          THE WITNESS:  Yeah.  There you go.

14  A.          There you go.

15  Q.          All right.  So net operating income --

16          MS. PARKER:  Thank you, Matt.

17  Q.          -- down here at the bottom:  NLI versus

18  budget.

19          Do you see that financial result there?

20  A.          Yes, I do.

21  Q.          What does this mean to you when you are

22  looking at it as the executive director and former

23  administrator of Richmond Place?  What do these values

24  mean?

25  A.          Well, the actual is a negative number,

94

1    the budget is a positive number and so it was a

2    negative number, a neg- -- negative variance.

3    Q.          And that means for -- for the record?

4    A.          That it's a negative amount of money.

5    Q.          Okay.

6    A.          Didn't meet budget, below budget.

7    Q.          The hours per resident day on this form,

8    if you will look up in the middle of the sheet it says:

9    EXCL/PL.  Do you know what that means?

10   A.          EX -- I think that means excluding

11   personalized living.  I think that's what that means.

12   Q.          What is --

13   A.          Personalized living was another company.

14   They did -- they did additional services where they

15   would do additional services in IL, like they would do

16   dog watching, sitting, cleaning out cat litter boxes

17   for people that needed help, they do private sitting,

18   they do housekeeping, they'd go on doctor's

19   appointments.

20   Q.          Got you.  Where is this hours per

21   resident day number coming from, this 9.24 number?

22   A.          I don't know exactly where it was coming

23   from but it's -- we were -- we had a lot more hours

24   than we were budgeted to have.

25   Q.          I mean, I'll tell you that the actual for

                                                        95

1  this year is 8.42 hours per resident day, and I've got
2  to tell you, even looking at the annual cost report for
3  this year, Richmond Place was not providing 8.42 hours
4  of direct care from nurses, RNs and LPNs, CNAs.  So I'm
5  wondering does this number include janitorial, dietary
6  staff as well?
7  A.          Yeah, it must -- it must include
8  everybody because if you -- if you're talking about
9  your CNAs and your nurses and you -- you're looking
10  more of like a -- like I said earlier, like a 4.0, 4.2,
11  something like that.  This has probably got maintenance
12  and everybody included in it and nursing administration
13  included in it that aren't -- that, you know, those
14  people that aren't considered hands-on care.
15  Q.          So this is a -- this is a, for lack of a
16  better word, rolled-up amount for everybody in the
17  building, including your janitors and your maintenance
18  workers, everybody?
19  A.          Yes, I believe so.
20  Q.          And that rolled up-value is the value
21  that gets reported on these score cards at the end of
22  the year; is that right?
23              MR. COCANOUGHER:  Object to form.
24  A.          Well, it looks like it on here.
25  Q.          Okay.  I've got one more financial

96

1    documents for you.  Try Tab 12.  Are you with me?

2    A.          Yes.

3    Q.          All right.  Let me go to a year -- one of

4    the years that you were there.  Let's do 2016.  And

5    let's do C Johnson 446 is the number that I'd like you

6    to look at.

7                     MR. COCANOUGHER:  Lara, is this in

8                this?

9                     MS. PARKER:  Oh, yes, it is.  It was

10               in the original set right before the

11               surveys.

12                    MR. COCANOUGHER:  Thank you.

13   A.          Okay.

14   Q.          Hang on a minute.

15                    MR. COCANOUGHER:  What was the Bates?

16               Sorry.

17                    MS. PARKER:  446.

18   Q.          All right.  So have you ever seen this

19   report before?

20   A.          Yes, I believe so.

21   Q.          So this was a report that you used in

22   your role as ED?

23   A.          I think this was like the one that came

24   out each month --

25   Q.          Okay.

                                                    97

1    A.              -- with the financial statement.

2    Q.              Did you also use it in your role as an

3    administrator?

4    A.              This one is a 12-month budget trend.

5    I -- I know.  It was just such a short period of time.

6    I don't recall.

7    Q.              At the bottom of this page do you see

8    that line that says:  NLI for CMIP bonus or CMIP bonus?

9    A.              Uh-huh (affirmative.)

10   Q.              What does that -- what does that mean in

11   the context of the form that you use?

12   A.              I think it had something to do with --

13   with the -- with the bonus.  It did.  I don't -- like I

14   said, I don't remember what CMIP stands for.  And it

15   was very -- it was very complicated thing, like I told

16   you.  I don't remember the exact -- how it all worked.

17   Q.              So -- but this form that you were given

18   monthly looked at net operating income and that somehow

19   or another went into the CMIP; is that right?

20                   MR. COCANOUGHER:  Object to form.

21   A.              Yes.

22   Q.              And since we are looking at net operating

23   income, we are obviously counting our expenses; right?

24   A.              Yes.

25   Q.              Which would include staffing as part of

1    that expense calculation; right?

2    A.          Yeah, that's going to be your biggest

3    expense, yes.  Labor.

4                    MS. PARKER:  Okay.  Let's go off the

5                    record for just a minute.

6                    VIDEOGRAPHER:  We're off the record.

7                    (Off-the-record discussion held.)

8                    VIDEOGRAPHER:  We're back on the

9                    record.

10   Q.          I'm still looking at C Johnson 446.  Do

11   you see that one up from NLI for CMIP bonus there's a

12   line that says:  Informational totals.

13                    Do you see that?

14   A.          Uh-huh (affirmative.)

15   Q.          And then five lines down there's a line

16   that says:  Rent net of other discounts.

17                    Do you see that?

18   A.          Uh-huh (affirmative.)

19   Q.          And then it's broken down per occupied

20   unit.

21                    Do you see that as well?

22   A.          Uh-huh (affirmative.)

23   Q.          So this is for BKD Richmond Place SNF.

24   That's what it says across the top; right?

25   A.          Uh-huh (affirmative.)

99

1    Q.          So this is the rent generated per

2    available bed in the SNF; is that correct?

3                    MR. COCANOUGHER:  Object to form.

4    A.          Per occupied bed.

5    Q.          If it helps I can give you the occupancy

6    number.

7    A.          Okay.  I'm sorry.  Were you waiting on

8    me?  I'm sorry.

9    Q.          I was.

10   A.          Okay.  Go ahead.

11   Q.          This number, this $7,895 in the month of

12   January, $7,372 in February, $7,871 in March, all of

13   the way across to December, $7,894 in December, is the

14   rent per occupied bed at Brookdale Richmond Place SNF;

15   is that correct?

16                   MR. COCANOUGHER:  Object to form.

17   A.          I believe so.

18   Q.          And you-all as a -- as the ED and as the

19   administrator who used this form and as the management

20   team, you-all described that value as rent; is that

21   correct?

22                   MR. COCANOUGHER:  Object to form.

23   A.          It looks like on here that it's described

24   as rent.

25   Q.          Did you-all describe the residents of the

                                                        100

1    nursing home as renters or rent when you -- when you

2    met as a team --

3                      MR. COCANOUGHER:  Object to form.

4    Q.          -- during your tenure?

5    A.          I believe that's more from the IL/PC

6    side.  I know this is the SNF, but that's more of

7    probably Brookdale's language.  But as an

8    administrator, no, we don't refer to them as renters.

9    We refer to them as residents or patients.

10   Q.          As an administrator you do that?

11   A.          Yes.

12   Q.          But Brookdale's language uses the term

13   "rent"; correct?

14   A.          Well, on here it looks like that it is.

15   I don't recall anybody from Brookdale calling residents

16   in the SNF renters.  Now, that is something that's used

17   in the IL.

18   Q.          Let's see -- all right.  Would you rely

19   upon a director of nursing to tell you when a

20   facility's level of staffing raises a red flag?

21                      MR. COCANOUGHER:  Object to form.

22   A.          Yes.

23   Q.          Brookdale/Richmond Place, during your

24   entire tenure, contracted with Medicare and Medicaid to

25   provide service; right?

                                                        101

1    A.          Yes.

2    Q.          The services they provided were necessary

3    to protect the residents; right?

4                    MR. COCANOUGHER:  Object to form.

5    A.          Yes.

6    Q.          The residents were relying upon

7    Brookdale/Richmond Place to provide care like a

8    reasonably prudent nursing home in like circumstance;

9    right?

10                    MR. COCANOUGHER:  Object to form.

11   A.          Yeah.  Yes.

12   Q.          And the residents are at increased risk

13   of physical harm if that care isn't provided correctly;

14   right?

15                    MR. COCANOUGHER:  Object to form.

16   A.          There's the potential for that.

17   Q.          And they're at an increased risk of

18   physical harm if there is not adequate staff; right?

19                    MR. COCANOUGHER:  Object to the form.

20   A.          Potentially, yes.

21   Q.          During your tenure as either ED or

22   administrator, was it permissible at Brookdale/Richmond

23   Place for a CNA to complete narcotics wasting logs?

24                    MR. COCANOUGHER:  Object to form.

25   A.          No.

                                                    102

1    Q.          Who should --

2    A.          I would not believe so.

3    Q.          Who should be completing narcotics

4    wasting logs?

5    A.          That should be a nurse or two nurses

6    together.

7    Q.          And that's going to be an LPN or an RN;

8    right?

9    A.          Yes, I believe it could be either one.

10   Q.          You'd agree with me that

11   Brookdale/Richmond Place, during your entire tenure,

12   had to follow the Residents' Rights Act; right?

13                    MR. COCANOUGHER:  Object to form.

14   A.          We aim to follow the Resident Rights,

15   yes.

16   Q.          That -- that, not just aim to, but that

17   Brookdale/Richmond Place is required to follow the

18   Residents' Rights Act?

19   A.          It's part of the regulations, yes.

20   Q.          Residents have the right to be clean;

21   right?

22                    MR. COCANOUGHER:  Object to form.

23   A.          That's one of the resident rights, yes.

24   Q.          Would you agree with me that it would

25   never be appropriate for a maintenance worker to

                                                        103

1    provide patient care?

2                    MR. COCANOUGHER:  Object to form.

3    A.        Uh --

4    Q.        Let me help you out because you are --

5    A.        I'm like what?  Really.

6    Q.        Let me -- let me make it more specific.

7              Would you agree with me that it would

8    never be appropriate for a maintenance worker to change

9    a resident?

10                   MR. COCANOUGHER:  Object to form.

11   A.        No.  Unless that maintenance worker was a

12   certified nursing assistant, which is possible.  I know

13   some that are.

14   Q.        Leaving that aside, if -- if the staff

15   member is not a certified nurse's assistant, if they

16   don't have a certificate, an LPN license, an RN

17   license, then they should not be changing residents;

18   right?

19                   MR. COCANOUGHER:  Object to form.

20   A.        No, I'm not -- no.

21   Q.        A patient always has the right to know

22   what medications they're being given; correct?

23   A.        Yes, they do.

24   Q.        And if a patient asks for information

25   about the medications and the dosages, the nurse should

                                                    104

1    provide that information to a patient; right?

2    A.          Yes, they should.

3    Q.          And the patient has the right to refuse

4    medication if they so desire; correct?

5    A.          Correct.  They have a right to refuse.

6    Q.          Would you be the person to ask about

7    qualifying or determining what conditions constitute a

8    change in condition or would you rely on your clinical

9    staff to do that?

10                   MR. COCANOUGHER:  Object to form.

11   A.          That would be a clinical question.

12   Q.          Do you agree with me that the resident

13   chart needs to reflect the care that was actually

14   provided to the resident?

15                   MR. COCANOUGHER:  Object to form.

16   A.          Yes.

17   Q.          And it would not be appropriate to change

18   or add things to a chart or delete things from a chart

19   after a resident was discharged; right?

20                   MR. COCANOUGHER:  Object to form.

21   A.          No, I don't believe so.

22   Q.          Where did the policies and procedures for

23   Richmond Place come from?

24   A.          What policies and procedures are you

25   talking about specifically?

                                                    105

1    Q.          Do they come from different places

2    depending upon the policy and procedure?

3    A.          I would say from -- I would say Brookdale

4    gets -- has their own corporate policies and

5    procedures.  Sometimes pharmacy has a pharmacy book

6    with their policies and procedures.

7    Q.          For instance, you did not sit down and

8    create the policies and procedures manual that was in

9    effect at the time of your administration at Brookdale?

10   A.          No, I did not.

11   Q.          I think what I've been given as the

12   policies and procedures table of contents, it's behind

13   Tab 3 in that binder.  I just want to see if you can

14   look at that and tell me if that is, in fact, the table

15   of contents.

16   A.          That's what it says, Brookdale Policies

17   and Procedure Manual.

18   Q.          Does this look familiar to you as the

19   policies and procedures table of contents that were in

20   effect during the time that you were at Brookdale?

21                    MR. COCANOUGHER:  Object to form.

22   A.          I can't tell you that a hundred percent.

23   I don't know if there's any changes.  I don't know.

24   Q.          What I'm really looking for, a lot of

25   these nursing homes will have like a clinical manual,

106

1    which I think this is, the policies and procedures for

2    the clinical manual, but then they'll have other

3    manuals for other issues --

4    A.           Uh-huh (affirmative.)

5    Q.           -- like maybe a manual specific to -- I

6    don't know, narcotics or they may have a manual

7    specific to how we're going to train folks, they may

8    have a personnel policy manual for nurses.

9    A.           Right.

10   Q.           And I'm wondering if those other manuals

11   existed or was this it?  Was this the only Brookdale

12   Policies and Procedures you-all had?  Because I was

13   thinking you would have had like an employee manual at

14   least.

15   A.           Oh, yeah, yeah.  This is just the -- this

16   is just -- it's got the grievance log stuff in it so

17   it's part of social services, it's got resident

18   council.  It looks like most of it is nursing.  I don't

19   see anything in here that would be HR or employee

20   related.

21   Q.           Where would I go -- what manual would I

22   go to, if I were a Brookdale employee, to find the

23   division of labor between different types of direct

24   caregivers?

25   A.           Okay.  So are -- are you asking me

                                                                107

1    what -- what a CNA is allowed to do, or are you talking
2    about a job description?  what -- what -- what are you
3    asking me?
4    Q.          I'm asking you if there is a policy that
5    Brookdale has or maybe it's in a job description,
6    explaining what CNAs are going to do here, versus what
7    LPNs are going to do here, versus what RNs do here?
8    A.          I would say -- I would say, and I'm not a
9    hundred percent, okay, but I would say it would be in
10   the job description that would be able to tell you
11   that.
12   Q.          Okay.
13   A.          And you know, and obviously, you want to
14   work within your scope of practice.
15   Q.          Other than the job description, any other
16   places you can think of where I would find that
17   information?
18   A.          For RNs and LPNs and CNAs specifically?
19   Q.          Correct.
20   A.          I mean, I would say the job description
21   would be your main thing.  Something else, I mean,
22   would be, you know, I mean -- I mean licensed personnel
23   as far as LPNs and RNs should know what they're allowed
24   to do and not allowed to do as part of their license
25   requirements.

108

1    Q.          Okay.  That bonus that you received as

2    executive director, was that also tied to the

3    performance of the skilled nursing facility?

4    A.          I think there was a small portion of it

5    that was tied to the nursing facility.

6               MS. PARKER:  Give me five minutes to

7               organize and we might be close to being

8               done.

9               VIDEOGRAPHER:  We're off the record.

10              (Off-the-record discussion held.)

11              VIDEOGRAPHER:  We're back on the

12              record.

13   Q.          At any time that you were executive

14   director or administrator, were you involved in dealing

15   with marketing or admissions of residents to the

16   skilled nursing facility?

17   A.          We would have a -- we would have a weekly

18   marketing meeting generally over in IL.  And some of

19   the liaisons would come over there and they would talk

20   about census and -- and what hospitals they were going

21   to go to and different things like that.

22   Q.          And when you say one of the ladies, do

23   you mean one of the admissions folks?

24   A.          Liaisons.  We had -- I'm trying to think

25   back when I first started as the executive director,

                                                      109

1    there was two nurse liaisons, and when I was the

2    administrator there was a nurse liaison and then one of

3    the -- actually, admissions folks that I think her

4    background was more in social work, became one of the

5    liaisons, and you know, we talked about marketing.

6    Q.        So those nurse liaisons, do you remember

7    their names?

8    A.        When I started out as the executive

9    director so probably during the time -- during this

10   time that you are talking about would be Lisa Dotson.

11   She was an LPN at the time.  She's an RN now.  She

12   currently works for Brookdale.  And then the other one

13   was, I think she was an RN, and her name was

14   Sandy -- oh, I can't think of what her last name was.

15   But I think she retired.

16   Q.        So she no longer works for Brookdale?

17   A.        No.

18   Q.        Do you remember anybody else who did that

19   role?

20   A.        Laurie Ballard did it when I was the

21   administrator of the SNF.

22   Q.        I understand Ms. Ballard no longer works

23   for Brookdale; right?  Or does she?

24   A.        I think she still does.

25   Q.        Okay.

110

1    A.          But I -- I hadn't heard that she left,
2    not that I would -- anybody would tell me.  But she's
3    been with them for a long time.  And I know that Lisa
4    had left, Lisa Dotson, and Lisa is back with them.
5    Because I actually ran into her the other day.  So,
6    yeah.
7    Q.          Anybody else you remember that did that
8    role?
9    A.          As a liaison?
10   Q.          Yes.
11   A.          With the SNF or the IL side?
12   Q.          The SNF.
13   A.          Sandy, Laurie, Lisa.  I think that was
14   all.  That went outside in the public?
15   Q.          Right.  Or was part of a marketing team,
16   admissions team for the SNF, you know.
17   A.          They had people that did the paperwork.
18   I don't know if they were really marketing.
19   Q.          You are talking about the intake
20   paperwork?
21   A.          Yes.
22   Q.          That's -- that's after you convert a
23   potential resident to a resident; right?
24   A.          Correct.
25   Q.          I'm really talking about that potential

                                                       111

1    resident time period.

2    A.          Yeah, the marketing -- I think that was

3    all of the marketing people during my tenure.

4    Q.          When you would have those meetings about

5    the SNF and you talked about marketing, would you talk

6    about what you wanted those liaisons to say when they

7    recruited or was it just more about general numbers?

8    A.          Any of the meetings that I was in, I

9    don't recall ever talking about telling them what we'd

10   want them to say.  I mean, I don't -- I don't know.  I

11   don't recall any specific conversations.  Most of the

12   marketing was -- it was -- it was over in the IL when

13   they would come to those meetings that I was at and it

14   was mainly focused on IL and driven by the sales

15   director for Brookdale that took care of IL and PC, the

16   liaisons would just come and they may report, you know,

17   we went to this hospital, this hospital, and we're

18   going to have this event, and we're going to offer CEUs

19   here and do this this week, that type of thing.

20   Q.          So just general updates it sounds like?

21   A.          Yeah, I don't recall having specific

22   conversations.  Well, tell somebody this.

23   Q.          Do you know if there are any materials

24   for those marketing folks about how to market the

25   facility, any policies and procedures or scripts, or

                                                      112

1    things of that nature?  Training materials about how to
2    be a liaison?
3    A.          I'm -- I don't recall offhand what they
4    say, but I mean, they went to sales training
5    specifically.  They had training that they went to
6    maybe out of state and so I'm sure there is some -- I
7    don't know for sure.  But literature out there
8    somewhere.  But they did have some kind of sales
9    training in those positions.
10   Q.          Was that sales training that they went to
11   out of state, was that a Brookdale sales training or
12   outside sales training?
13   A.          Brookdale.
14   Q.          How long was that training program?
15   A.          I don't -- I don't recall specifically.
16   The liaisons were there before I got there and I'm not
17   sure if Laurie had -- it may have been a week-long
18   training.  I don't know if Laurie had gone to the
19   training before I left or not.  I don't recall.
20   Q.          And I'm -- I'm betting that you don't
21   have any information about what sort of materials
22   existed in that sales training; right?
23   A.          No, I don't know specifically.
24   Q.          I'd have to ask them; right?
25   A.          Correct.

113

1    Q.          I can do that.

2               Any other trainings besides that one

3    specific to those liaisons or any other policies and

4    procedures specific to those liaisons you know about?

5    A.          I know there was weekly sales calls.  But

6    I'm not sure if the liaisons were on that.  It was more

7    focused on IL and PC, the host -- the biggest part of

8    the sales program was.

9    Q.          Were there any materials specific to the

10   SNF, marketing materials like brochures?

11   A.          I don't know.  I'm sitting here trying to

12   picture it.  And I'm sure they had some kind of

13   materials that they took out with them, but I don't

14   recall exactly what they looked like or what they said

15   exactly.

16   Q.          When I showed you that notation in the

17   budget a while back that broke down revenue for

18   patients by rent, do you remember when I showed you

19   that notation?

20   A.          Uh-huh.  (Affirmative.)

21   Q.          And I think you mentioned that, as an

22   administrator, you call folks who lived in the nursing

23   home "residents"?

24   A.          Correct.

25   Q.          And not "renters"; correct?

                                                        114

1    A.          Right.

2    Q.          Why is it important to you, as an

3    administrator and as a professional with 20-some years

4    experience as an administrator, to call those folks

5    "residents" and not "renters"?

6                    MR. COCANOUGHER:  Object to form.

7    A.          It's just all I know as far as -- it's

8    all I know is they've always been residents.  That's

9    what I've always called them.  We take care of them.

10   Q.          Okay.  Would you agree with me that, if

11   Brookdale severely overinflated its staffing sheets

12   that it posted at the door of the facility about how

13   many staff were on duty every day, that could be

14   misleading?

15                   MR. COCANOUGHER:  Object to form.

16   A.          I don't know of Brookdale doing that.

17   Q.          I understand that you don't know whether

18   they did that.  I'm not asking you to make a factual

19   determination about whether they did that.  I'm not

20   asking that.  I'm asking you if you'd agree with me

21   that, if that happened, we can even say, not say

22   Brookdale.  Say it this way.

23                   Would you agree that, if a nursing home,

24   in the abstract, severely overinflated the numbers on

25   their staffing sheets, that could be misleading?

                                                        115

1    A.          Yes, it could.

2    Q.          And would you agree with me that, if a

3    nursing home overinflated the numbers, that it claimed

4    it was providing in direct care to Medicare, that could

5    be misleading?

6                    MR. COCANOUGHER:  Object to form.

7    A.          Yes.

8                    MS. PARKER:  I think those are all of

9                    the questions that I have for you.  Thank

10                   you.

11                   THE WITNESS:  Thanks.

12                   ------------------------

13                        EXAMINATION

14   BY MR. COCANOUGHER:

15   Q.          All right.  Ann, just so we are clear, I

16   think you have discussed this earlier, but you were the

17   executive director at -- of the Richmond Place campus

18   October of 2016 to February of 2018; correct?

19   A.          Correct.

20   Q.          Carrie Johnson was a resident from

21   October of 2017 to November of 2017.  So during that

22   particular time period, you were the executive

23   director?

24   A.          Correct.

25   Q.          Randy Conforti was the administrator

                                                        116

1    during that specific time period?

2    A.          Correct.

3    Q.          And as the executive director, you have

4    testified about different meetings that you would have

5    with Randy, maybe once a week?

6    A.          Yes.

7    Q.          Would you have, though -- would the

8    administrator of the facility, for example, Randy

9    during that time period, would it have been the

10   administrator's job to be the front line on the -- for

11   example, staffing that you have discussed today?

12   A.          Yes.

13   Q.          And then so Randy would be the one making

14   decisions that he then may come to you and talk to you

15   about in that weekly meeting?

16   A.          Yes.

17   Q.          Do you know if Randy would also -- I

18   guess you would have been Randy's direct report?

19   A.          Yes.  Correct.

20   Q.          And from what you recall for the overtime

21   report that you had to fill out, you had to do two

22   separate reports -- actually, you did -- you did the

23   report for the IL, PC, and memory care; correct?

24   A.          Yes.

25   Q.          The -- you may have sent along a report

1     for the SNF, but that would have been the report that

2     Randy provided to you?

3     A.              It was either the report Randy provided

4     to me or the numbers that Randy provided to me that I

5     put into that report.

6     Q.              So Randy would have been providing you

7     the content to put in the report?

8     A.              Yes.

9     Q.              And from what you can recall about when

10    you were the -- specifically the executive director,

11    you had a separate budget for the IL, PC, and memory

12    care; correct?

13    A.              Separate from the SNF.

14    Q.              From the SNF.

15    A.              Yes.

16    Q.              When I say SNF, I mean the SNF.

17    A.              Correct.  Yeah, Brookdale managed the

18    IL -- during part of the time of me being there,

19    Brookdale didn't -- they managed the IL, PC and memory

20    care, but didn't own it like they did the nursing home.

21    So they were two different business units.

22    Q.              Business units?

23    A.              Yeah.

24    Q.              And do they have a number for the

25    particular business unit?

                                                      118

1    A.          Yeah, they -- yes.

2    Q.          Like on some of the documents?

3    A.          I think it was like that 50167 or

4    something like that was the -- the SNF.

5    Q.          So from what you remember, the IL, PC and

6    memory care had a different number?

7    A.          Yes.

8    Q.          As a different business unit?

9    A.          Yes.

10   Q.          I think you may have said this, but just

11   so I'm clear, was it your understanding that and -- is

12   her name Beth Mell, M-E-L-L?

13   A.          Yes.  I think she got married too and it

14   may have changed to Harris or something like that.

15   Q.          And it was your understanding that Beth

16   Mell was in the same level as Sherry Robinson?

17   A.          I believe so.  Each -- each region was

18   done a little bit different and -- but Beth Mell was a

19   VP and Sherry Robinson was a VP.  Sherry Robinson

20   worked in the -- when she was talking about entry

21   level, she did a lot of entry level communities

22   whereas -- entry fee communities, whereas the Lexington

23   CCRC was not entry fee.

24   Q.          You are not an attorney; correct?

25   A.          Correct.

                                                        119

1    Q.          You are not a medical doctor; correct?

2    A.          Correct.

3    Q.          Have you ever testified as an expert on

4    the legal medical malpractice standard of care?

5    A.          No.

6    Q.          So when you were talking about standard

7    of care and being asked about standard of care earlier

8    today, what you were describing was what you think

9    nurses try their best to do?

10   A.          Correct.

11   Q.          And all staff?

12   A.          Correct.

13   Q.          When you were the executive director, did

14   they have a person whose job was like staffing

15   coordinator?

16   A.          At --

17   Q.          At the SNF.

18   A.          Yes.  Yes, they did.

19   Q.          What is the -- is there a particular

20   number for PPD that is required by Kentucky in a

21   skilled nursing facility?

22   A.          No.

23   Q.          What is the requirement?

24   A.          (No audible response.)

25   Q.          Let me -- let me ask it this way.  Is it

1    your understanding that the regulation requires

2    staffing to meet the needs of the residents?

3    A.          Correct.

4    Q.          You were asked questions about the CMS

5    expected staffing level.  To your knowledge, is a

6    nursing home required in any way to follow the CMS

7    expected staffing ratios?

8    A.          No.

9    Q.          Could the skilled nursing facility be

10   cited for not following the CMS expected staffing

11   ratios?

12   A.          Not that I know of.

13   Q.          However, could CMS or could OIG or the

14   Cabinet for Health and Family Services, if they made a

15   determination that a Kentucky nursing home did not have

16   sufficient staff to meet the needs of the residents,

17   there is a tag for that?

18   A.          Correct.

19   Q.          During the time you were the executive

20   director or the administrator, can you ever recall

21   Richmond Place, the skilled nursing facility, getting

22   such a tag?

23   A.          No.

24   Q.          When you were thinking about adding staff

25   members and the difference that adding a particular

121

1    position would be, would you agree that you have to

2    take into account the work ethic of the person who you

3    are adding?

4    A.          Yes.

5    Q.          So my point is, all of your staff --

6    staff members are not the same and they -- they are not

7    producing the same amount of work; correct?

8    A.          Correct.

9    Q.          So adding one person may or may not make

10   a difference?

11   A.          That is true.

12   Q.          And you discussed when you were the

13   administrator, so from February of 2018 through August

14   of 2018, you added RNs as staff development, ADON, MDS,

15   DON and others, and so because you had nurses in all of

16   those positions, those people could come and work the

17   floor, if necessary; correct?

18   A.          They could.  And they did.

19   Q.          And that would have been the rationale

20   for why you hired nurses for those positions whereas,

21   for example, a medical director -- medical records

22   director wouldn't necessarily need to be a nurse?

23   A.          Right.  You don't have to have a medical

24   records per- -- that person doesn't have to be a nurse,

25   your admissions person doesn't have to be a nurse, and

                                                    122

1     let's see, I added medical records, I added admissions

2     as a nurse and my staffing coordinator, ended up adding

3     her as a nurse.  They weren't RNs, but they were --

4     they were LPNs and they were part of the on-call

5     rotation, and they were salary, and if we did have a

6     call-in or you got a certain level with staffing, they

7     would have to work as an extra -- you know, an extra

8     person to help you with the staffing.

9     Q.          Let's say, on a particular day, every

10    position is filled, everyone shows up and does their

11    job at Richmond Place, let's say while you are the

12    administrator.

13    A.          Okay.

14    Q.          Do you have enough staff there?

15    A.          Yes.

16    Q.          Would staff be sufficient if that

17    happened?

18    A.          Yes.

19    Q.          When you were the administrator and you

20    would attend the quality assurance meetings, do you

21    know if you would -- you or one of the other members of

22    the committee would actually bring reports into the

23    meeting?

24    A.          Yes.

25    Q.          Do you remember what those reports were?

1    A.          We had a -- like a QAPI agenda sheet that
2    we went by and then MDS, I'm pretty sure it was MDS,
3    they would bring the quality measure, social services
4    would bring the -- any grievances.  We talked about
5    everything from the month before.  So we'd go over the
6    grievances, nursing would have their listing of
7    clinical stuff, such as infections, falls, pharmacy
8    would go over psychotropic, antipsychotics, the
9    pharmacy report.
10   Q.          And would those documents that you
11   brought in, would that be what you were using to
12   compile the actual meeting minutes?
13   A.          Yes.
14   Q.          And for those items, would you be
15   e-mailing those items outside of the committee?
16   A.          No, not necessarily.
17   Q.          When you were the administrator and you
18   attended the QA meetings monthly, would regional staff
19   also attend those when they were there?
20   A.          I'm sure that they did if they were
21   there.  I don't recall specifically.
22   Q.          Are you familiar with the certification
23   which I've heard called a KMA or a med tech?
24   A.          Yes.
25   Q.          Do you know one way or the other whether

1    or not a KMA or a med tech who is certified is able to

2    sign off on the narcotics wasting logs?

3    A.          I don't believe so.

4    Q.          Okay.  Do you know what they are able to

5    do and not do as far as passing out meds?

6    A.          I'm not sure if they can pass out

7    narcotics or not.  I'm not sure.

8    Q.          Okay.

9    A.          I'm not sure about that first question

10   you asked.  I'm not a hundred percent sure about that.

11   Q.          But there is a program or a certification

12   for someone who is not a nurse but they're certified to

13   at least pass certain meds?

14   A.          Yes.

15   Q.          As the executive director during Carrie

16   Johnson's residency, so October 20 of 2017 through

17   November 9 of 2017, were you ever made aware of a

18   maintenance worker, a male maintenance worker, changing

19   briefs?

20   A.          I don't re- -- I don't recall hearing

21   that.

22   Q.          Okay.  So during the time, the entire

23   time you were there, so let's start as the executive

24   director, can you recall any conversations with anyone

25   at Brookdale or otherwise wherein you discussed

125

1    overstating staffing numbers in any way?

2    A.          No.

3    Q.          Same question as the administrator,

4    February to August of 2018, any conversations with

5    anyone at Brookdale or otherwise, where you discussed

6    with someone else, overstating staffing in any way?

7    A.          No.

8    Q.          You testified that during your tenure

9    as -- as an executive director, you would not have been

10   a person -- you would not have been the person to fill

11   out the CMS 671; correct?

12   A.          Correct.

13   Q.          Even as the administrator in 2018, to

14   your knowledge, you never filled out a 671; correct?

15   A.          It was not an annual survey when I was

16   there so I don't believe that I ever filled one out.

17   Q.          You did -- you were not involved in

18   preparing the cost reports which you looked at but were

19   not familiar with earlier; correct?

20   A.          Right.  I've not filled out a cost

21   report.

22   Q.          And even after -- after leaving in August

23   of 2018, any conversations with anyone at Brookdale or

24   otherwise, about Richmond Place Skilled Nursing

25   Facility intentionally overstating staffing numbers?

1    A.          I don't know anything about that.  I've
2    never -- I've not heard about that.
3                      MR. COCANOUGHER:  I think that's all
4                I have.
5                ------------------------
6                      EXAMINATION
7    BY MS. PARKER:
8    Q.          Real quick.  Let's look at Tab 11 in your
9    binder.  Okay.  That's one of those CMS 671 forms,
10   isn't it?
11   A.          Yes.
12   Q.          This one is Bates stamped C Johnson 125.
13   Are you looking at the same one I'm looking at?
14   A.          Yes.
15   Q.          Okay.  Under nursing services we have RN,
16   director of nurses, claiming 80 hours; right?
17   A.          Uh-huh.  (Affirmative.)
18   Q.          Am I correct in reading that?
19   A.          Yes.
20   Q.          Nurses with administrative duties, 589
21   hours.  Am I correct in claiming that?
22   A.          Okay.
23   Q.          Do you see where I'm at?
24   A.          Yes.
25   Q.          That nurses with administrative duties

MODERN SCRIBE - susan@modernscribe.net

1    column at 40, as you know from filling those out, you

2    will agree with me that that's the nurses in those

3    director roles you were talking about; right?

4                        MR. COCANOUGHER:   Object to form.

5    A.              Nursing with administrative duties.

6    Q.              Yeah.

7    A.              Yeah, it would be like MDS, the director

8    of nursing, the assistant director of nursing.

9    Q.              What is the next category down,

10   registered nurses, F41, what goes in that box?

11   A.              That would be nurses that are actually

12   working on the floor.

13   Q.              And can you just read for the record how

14   many full-time staff hours were claimed on this form

15   for registered nurses?

16   A.              681.

17   Q.              How many part-time staff were claimed?

18   A.              308 hours.

19   Q.              And how many contract were claimed?

20   A.              I don't see any on there.

21   Q.              Uh-huh (affirmative.)  So if my math is

22   right, add up 689 and 308, you get 979 RN floor hours.

23   You agree with me on that?

24   A.              All right.  I'm sorry.  Say that again.

25   Q.              Just 681 but 308, is it 979 or did I do

1    it wrong?

2                   MR. COCANOUGHER:  989.

3                   THE WITNESS:  989.

4    Q.          989.  Thank you.  So we can agree 989 RN

5    floor hours were claimed on this form?

6    A.          Yes.

7    Q.          All right.  I'll represent to you that

8    the Kronos data for this time period reflects that,

9    depending on how you count the pay periods, there was

10   only between 590 and 670 RN hours, RN floor hours

11   worked during this time period.

12                  Do you have any reason, sitting here

13   today, why this misrepresentation would have been made?

14                  MR. COCANOUGHER:  Object to form.

15   A.          Well, I wasn't there.  Okay.  And so I

16   wasn't employed by them.  And I didn't work with Benita

17   so I don't know.  But if you want me to tell you a

18   reason potentially why, I mean, potentially, let's say,

19   MDS worked the floor and they were salary and didn't

20   clock in.

21   Q.          So you --

22   A.          The assistant director of nursing worked

23   the floor and they were salary and they didn't clock

24   in, so therefore, it didn't -- wasn't reflected on

25   Kronos.  That could be a reason.

                                                         129

1    Q.          So laying that aside, which Ms. Dickenson

2    testified in another matter that would have varied the

3    numbers two to four percent, that very issue, can you

4    think of any other reason why it would have been

5    reported that you-all had nearly a thousand hours of RN

6    direct care when you only had 595 to 672 hours?

7                         MR. COCANOUGHER:  Object to form.

8    A.          I would just be speculating because I

9    don't know.

10   Q.          Okay.  This is my one opportunity to ask

11   you before trial, so just to put a fine point on it,

12   you can't think of any reason that that would be

13   appropriate sitting here today; right?

14                        MR. COCANOUGHER:  Object to form.

15   A.          That Kronos said a certain amount and

16   then this is higher?  The only thing that I can think

17   of just offhand would be if you had a salary person,

18   right, working and it's not reflected in Kronos or

19   there's a mistake.  I mean -- I mean -- there's lots

20   of -- I -- I don't know.  There was agency people and

21   they weren't put on here under contract and should have

22   been.  So there could have been a mistake with that.

23   That's -- you know, unless there's just a mistake.  I

24   don't know.  I don't know.

25   Q.          A mistake or floor people who worked and

                                                      130

1    weren't in Kronos; is that right?  Is that the only two

2    reasons you can think of?

3                    MR. COCANOUGHER:  Object to form.

4    A.          Yeah.  Yeah, it could have been agency

5    people that instead of putting it under contract, like

6    she should have, which wouldn't have been reflected in

7    Kronos, maybe that's the reason or someone that's

8    salary that's their hours aren't reflected in Kronos,

9    putting it in there.

10   Q.          Other than that, no other reasons; right?

11   A.          I can't think of anything.

12                    MS. PARKER:  Okay.  Thank you.

13                    MR. COCANOUGHER:  That's all you

14               have.

15                    VIDEOGRAPHER:  This concludes the

16               deposition.  We're off the record.

17                    (Aforementioned documents were filed

18               with this deposition, having been

19               previously marked as Exhibit No. 1 for

20               purposes of identification.)

21               --------------------------

22               (DEPOSITION CONCLUDED)
         _____

23

24

25

                                                              131

1  STATE OF KENTUCKY   )
   COUNTY OF FAYETTE   )
2

3              I, SUSAN R. ELSENSOHN, Certified Court
4  Reporter and Notary Public, State of Kentucky at Large,
5  certify that the facts stated in the caption hereto are
6  true; that at the time and place stated in said caption
7  the witness named in the caption after being by me duly
8  sworn, was examined by counsel for the parties; that
9  said testimony was taken down in stenotype by me and
10 later reduced to typewriting, by computer, under my
11 direction, and the foregoing is a true and complete
12 record of the testimony given by said witness.
13             No party to said action nor counsel for
14 said parties requested in writing that said deposition
15 be signed by the testifying witness.
16             My commission expires:  September 9,
17 2022.
18             In testimony whereof, I have hereunto set
19 my hand and seal of office on this the _____ day
20 of _____, 2019.
21
22                    _____
                      SUSAN R. ELSENSOHN
23                    Certified Court Reporter
                      Notary ID No. 606854
24                    Notary Public, State-at-Large
25

                                                    132

MODERN SCRIBE - susan@modernscribe.net