UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CIVIL DIVISION
(at Lexington)

**Electronically Filed**

| | | |
|---|---|---|
| CARRIE JOHNSON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:19-064-DCR |
| | ) | Removed from Fayette Circuit |
| V. | ) | Court, Case No. 18-CI-03625 |
| | ) | |
| BLC LEXINGTON SNF, LLC d/b/a | ) | |
| Brookdale Richmond Place SNF, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF MOTION TO CERTIFY CLASS</u>

Comes the Plaintiff, Carrie Johnson, on behalf of herself and all others similarly situated, and for her Memorandum of Law in support of Motion to Certify Class, hereby states as follows:

From April 1, 2014 to March 31, 2018, Defendant Brookdale Senior Living, Inc., through its employees and shell corporations, [1] defrauded Kentucky consumers by advertising false staffing data on the Federal Government consumer-facing website, Nursing Home Compare. The United States Department of Health and Human Services, Centers for Medicare & Medicaid Services ("CMS"), recognizes that "[t]here is considerable evidence of a relationship between nursing home staffing levels and resident outcomes,"[2] and therefore requires nursing homes to

---

[1] Brookdale Senior Living, Inc. is a publicly traded corporation with the stock ticker BSL. It directly controls the operation of hundreds of skilled nursing, assisted living, and retirement communities across the United States. It exerts this control through a number of shell corporations, one of which is BLC Lexington SNF, LLC, the license holder for the skilled nursing facility operated at 2770 Palumbo Drive, Lexington, Kentucky. First Disclosure of Christopher Cherney, attached hereto under seal as Exhibit 1, page 12-17; Rebuttal Report of Valerie J. Gray, attached hereto under seal as Exhibit 2, page 7 (discussing general ledger amounts earmarked for corporate, rather than facility-level, expenditures.); *see also* Plaintiff's Response to Motion to Dismiss for Lack of Personal Jurisdiction and attached Exhibits, [DN 111. Throughout this Motion, Plaintiff will refer to Defendants collectively to refer to the actions of the corporate scheme as a whole, including those actions taken through 100% controlled subsidiary shell corporations.

[2] CMS Five Star Rating Technical User Guide, 2015, at 43, attached hereto as Exhibit 3. This same language appears in every Technical User Guide applicable to the class period. *Id.*

provide accurate staffing information to consumers. Defendants reported their staffing levels to Kentucky state nursing home inspectors using CMS-671 Forms.[3] The staffing data on these CMS-671 Forms, in turn, was converted into a "star rating" of one to five, with five being the best, showing the amount of care per resident per day that a Richmond Place resident receives. This star rating is then posted on the Nursing Home Compare website, which is designed to allow consumers to "find and compare nursing homes certified by Medicare and Medicaid."[4] Defendants recognize that the star ratings on Nursing Home Compare are utilized by consumers to compare nursing homes. They also recognize that if Defendants provided false data on their CMS-671 Forms, then the data on Nursing Home Compare could be misleading to consumers and, indeed, fraudulent:

| Defendant Benita Dickenson, Administrator of Richmond Place, 2014-2016 | Q. So the Nursing Home Compare data is available to the public; right?<br>A. Yes.<br>Q. To consumers?<br>A. Yes.<br>Q. And to potential families and residents; correct?<br>A. It's available to everyone.<br>Q. And those potential families and residents can use it to compare nursing homes; right?<br>A. Yes.[5]…<br>Q: Q. If the facility's five-star rating was inaccurate, do you agree with me that that could be misleading?<br>A. If it were inaccurate, I do agree -- I mean, yes, that could be misleading.[6] |
|---|---|
| Defendant Ann Phillips, Executive Director and Administrator, 2016-2018 | Q: So the rating system is available to the public, right?<br>A: Yes, it is.<br>Q: And the public uses it to compare nursing homes, right?<br>A: They can.<br>Q: And you know, as an administrator and as a former [executive director], that the data submitted to Medicare has to be accurate; right?<br>A: Yes.<br>Q: And if the data is not accurate that could potentially be Medicare fraud, right?<br>A: possibly….[7]<br>Q:Would you agree with me that, if a nursing home overinflated the numbers, that it claimed it was providing in direct care to Medicare, that could be misleading? |

---

[3] Defendants' CMS-671 Forms for the relevant class period are attached hereto as Exhibit 4.
[4] MEDICARE.GOV, *Nursing Home Compare: How can Nursing Home Compare help you?,* last accessed Apr. 30, 2020 <https://www.medicare.gov/NursingHomeCompare/About/howcannhchelp.html>
[5] Deposition of Benita Dickenson, full PDF attached hereto as Exhibit 5, at 44, ll. 1-11.
[6] *Id.* at 65, ll. 7-12.
[7] Deposition of Ann Phillips, full PDF attached hereto as Exhibit 6, p. 49, ll. 12-25; p. 50, ll. 1-2 (objections omitted.).

| | |
|---|---|
| | A: Yes.[8] |
| Stacy Trunecek, Brookdale Operations Specialist | Q: If Brookdale reported numbers [on the CMS-671 Form] in order to obtain a higher star rating when they actually didn't have the number of staff in the building, regional or otherwise, that could be misleading to consumers, right? <br> A: You're saying if we put a higher number than was actually there, that that's misleading. That could be, yes.[9] |
| Sherry Robinson, Senior Vice President of Operations | Q: Why is it important for you to see what your communities are in terms of star rating? <br> A: Well because it's public knowledge, I mean we always want to be the best. We are all competitive and you know we know that the consumer might possibly look at those.[10] |

Every time the star ratings were released, all managers – from the facility level[11] to the highest corporate levels[12] – received an email containing Richmond Place's new star ratings. At the same time, those same managers had bi-weekly access to Richmond Place's actual staffing levels which showed that the new star ratings were severely overinflated.[13] Based on review of the CMS-671 Forms and internal staffing data available to Richmond Place managers during these same time periods, Richmond Place routinely submitted false CMS-671 Forms over the course of five years. Exhibit A: Star Ratings attached to the Expert Report of Valerie Gray, and filed hereto under seal as Exhibit 10, compares the star ratings Richmond Place claimed on its CMS-671 Forms versus the star ratings it should have actually received. Over the class period, Richmond Place never once submitted a true CMS-671 Form, instead claiming, on average, that it was a 4-5 star facility when in fact it was a 1-2 star facility.[14] Consequently, the putative class members paid for 4-5 star

---

[8] *Id.* at 115, l. 25; 116, ll. 1-7.

[9] Deposition of Stacy Trunecek, full PDF attached hereto as Exhibit 7, p. 37, ll. 23-25; p. 38, ll. 1-7.

[10] Deposition of Sherry Robinson, full PDF attached hereto as Exhibit 8, p. 84, l. 12-19.

[11] *See, e.g.,* Deposition of Amanda Mather, full PDF attached hereto as Exhibit 9, p. 154, ll. 16-21 (discussing facility-level access).

[12] Deposition of Sherry Robinson, Exhibit 8, p. 83, ll. 6-12.

[13] Deposition of Ann Phillips, Exhibit 6, p. 32, ll. 14-20; Deposition of Sherry Robinson, Exhibit 8, p. 47, ll. 16-25, p. 48, ll. 1-16.

[14] *Id.* Interestingly, Defendants' disclosed expert – Dr. John Bowblis – also agrees that Richmond Place's staffing data does not support the amount of direct care staff claimed on Richmond Place's CMS-671 Forms. He calls these staff members "missing" staff and calculates that "missing" staff totals on average between 4-6 RNs per day. Bowblis Report, [DN], at 171 (Exhibit 12), *filed by Defendants under seal*. Dr. Bowblis then asks this Court to assume the existence of these "missing" staff without any data to support this assumption. As contemplated by Plaintiffs' rebuttal expert reports, if Dr. Bowblis' calculations are correctly performed, the actual number of missing staff jumps to 12-14 staff a day. Rebuttal Report of Valerie Gray, Exhibit 2, at 4. Plaintiffs' experts and Defendants' experts, then, disagree about the scope of the misrepresentations made by Defendants on Defendants' CMS-671 Forms, which is a question of materiality, rather than the fact of the misrepresentation.

nursing care and they received 1-2 star nursing care.

The monetary effect of Defendants' false CMS-671 Forms is measurable. As a Medicare-certified facility, Richmond Place must submit a host of financial information on a yearly basis to CMS under penalty of perjury.[15] This financial information, called a Cost Report, attests the amount of dollars per hour that Richmond Place claims it pays its direct care staff. By taking this amount of dollars per hour and multiplying it by the amount of missing direct care hours per resident on any given day within the class period, Defendants' failure to provide the care promised can be quantified.[16] Plaintiffs' experts have quantified this diversion of money on a per-day per-resident basis. In the aggregate, Defendants' failure to provide the claimed amount of direct care staff totals $3.8 million over 2014-2018 and $1.5 million in 2017 alone.[17] This diversion of funds constitutes a consumer protection violation under the Kentucky Consumer Protection Act, unjust enrichment, and fraud under the common law theories pled in Plaintiff's Third Amended Complaint [DN 27]. Plaintiff therefore respectfully requests that this honorable Court certify a class of Richmond Place residents who have been harmed by Defendants' conduct, as more specifically identified below.

### A. <u>Standard of Review</u>

Rule 23 of the Federal Rules of Civil Procedure sets forth the requirements for maintaining

---

[15] 2014-2018 Cost Reports, attached hereto under seal as Exhibits 11-15, attestations at (1), respectively.

[16] Calculations of Valerie Gray, Exhibit A: Summary, attached hereto under seal as Exhibit 2.

[17] *Id.* This discrepancy between actual and reported staffing correlates to Defendants' financial reporting. When one compares internal financial documents – called General Ledgers – with the verified and attested Cost Reports, Richmond Place told the Federal Government that it spent 39-52% more on staffing than it actually did. Second Report of Valerie Gray and Exhibit B, attached hereto under seal as Exhibit 16. Either this inflationary amount does not represent real dollars and correlates to an attempt to make the numbers claimed on the CMS-671 Forms look legitimate, or the discrepancy represents corporate liabilities not properly accounted for at the facility level. Either way, the Cost Reports claim amounts that are insupportable and undermine Defendants' claims before the Securities and Exchange Commission that they do not control the finances of the nursing homes under their corporate umbrella and are "dependent on loans, dividends, and other payments from our subsidiaries to generate the funds necessary to meet our financial obligations. *See, e.g.,* 2015 SEC 10K Form Excerpt, p. 36, attached hereto as Exhibit 17.

a class action. Under the rule, a party seeking to certify the class bears the burden to show that certification is proper. *In Re American Medical Sys. Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Courts engage in a "rigorous analysis" to determine whether the prerequisites of Rule 23 are satisfied in all respects. *Id.* at 1078-79 (internal citations omitted.). Questions of whether a class action will eventually be meritorious, however, are not generally considered on a certification motion. The Sixth Circuit Court of Appeals articulated the limited utility of a merit analysis in a Motion to Certify Class as follows:

> Since [*Wal-Mart Stores, Inc. v.*] *Dukes,* the Supreme Court has made clear that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – *but only to the extent* – that they are relevant to determine whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* - U.S. -, 133 S.Ct. 1184, 1194-95, 185 L.Ed2d 308 (2013) (emphasis added); *see also In Re Whirlpool,* 722 F.3d at 851-52 ("[D]istrict courts may not turn the class certification proceedings into a dress rehearsal for the trial on the merits." (internal quotation marks omitted)); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012) (explaining that although "conformance with Rule 23(a) … must be checked through rigorous analysis, … it is not always necessary … to probe behind the pleadings before coming to rest on the certification question, because sometimes there may be no disputed factual and legal issues that strongly influence the wisdom of class treatment.") (internal quotation marks omitted)).

*Rikos v. Procter & Gamble Co.,* 799 F.3d 497, 505 (6th Cir. 2015) (emphasis in original). Thus, a class should be certified if the movant satisfies all of the requirements of Rule 23(a) and one requirement of Rule 23(b), whether or not the movant is likely to prove that case at trial.

In order to achieve the aims of Rule 23, District Courts have wide-reaching discretion to fashion class actions into a usable administrative format. This discretion may extend to bifurcation of non-class claims or stages of the case, creation of subclasses, redefinition of the class, appointment of a special master, use of affidavits, or the employment of other administrative techniques. *Chisholm v. TransSouth Financial Corp.,* 194 F.R.D. 538, 554 (E.D. Va. 2000) (separation of non-class claims); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554 (2007) (separation of

liability and damages phases); *Hendricks v. Total Quality Logistics, LLC,* 292 F.R.D. 529, 538 (S.D. Ohio 2013) (approving of subclasses); *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 526 (6th Cir. 2014) (approving of appointment of special master and affidavits.). As more fully discussed below, Plaintiff's proposed class satisfies all of the requirements of Rule 23(a) and Rule 23(b)(3) for certification. To the extent that the Court concludes that the Plaintiff's proposed class action fails in one of these respects, Plaintiff respectfully requests that the Court fashion appropriate administrative relief or allow twenty (20) days to amend the Third Amended Complaint or this Motion to cure any potential defect.

### B. <u>Threshold Issues for Class Certification: there is a readily ascertainable class and Ms. Johnson is a member of that class.</u>

In addition to the requirements set forth in Rule 23, a court considering certification may also consider two threshold issues: first, whether there is a readily ascertainable class; and second, whether the proposed representative is a member of that class. *Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 335 (E.D. Ky. 2002); *see also Grubb v. Marcum*, 2006 WL 625148, No. Civ.A. 6:05-498-DCR at *3 (E.D. Ky. March 9, 2006) (conducting same analysis.). The class proposed by Plaintiff satisfies both of these threshold issues.

When determining whether a class exists, Courts have asked whether the plaintiff's class definition is ascertainable based upon objective facts as opposed to the state of mind of the individual. *Gevedon,* 212 F.R.D. at *3; *Foister v. Purdue Pharma L.P.*, 2002 WL 1008608, No. Civ.A. 01-268-DCR, *4 (E.D. Ky. Feb. 26, 2002). However, the class need not be ascertainable at the class certificate stage. At this stage of the litigation, "the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members." *In re Dial Complete Marketing and Sales Practices Litigation*, 312 F.R.D. 36, 50 (D. N.H. 2015). In defining objective facts for ascertainability, the Sixth Circuit has

approved of the standard of ascertainability set forth in *Moore's Federal Practice*, as follows:

> For a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria. In some circumstances, a reference to damages or injuries caused by particular wrongful actions taken by the defendants will be sufficiently objective criterion for proper inclusion in a class definition. Similarly, a reference to fixed, geographic boundaries will generally be sufficiently objective for proper inclusion in a class definition.

*Young v. Nationwide Mut. Ins. Co.,* 693 F.3d 532, 538–39 (6th Cir. 2012) (citing *Moore's Federal Practice* § 23.21[3] (internal citations omitted). The Court further noted that a class need never be ascertainable with "100%" accuracy." *Id.*; *see also Rikos,* 799 F.3d at 525 (quoting approvingly from *Young*.). Instead, the Court noted that a class need only be "discerned with reasonable accuracy." *Id.*

Based upon the definition provided in *Moore's Federal Practice*, the Court in *Young* found that in an insurance fraud case, a class definition referencing geographical boundaries of local governments and the location of the insured's "risk or property" satisfied this standard despite the need for manual file review and geocoding software. *Id.* Other courts in the Sixth Circuit have noted that the citizenship of class members is "an objective fact," and "simple and objective information," on which it is "no doubt feasible and practical to conduct a survey" post-certification. *Littler v. Ohio Ass'n of Pub. Sch. Employees*, No. 2:18-CV-1745, 2020 WL 1861646, at *14 (S.D. Ohio Apr. 14, 2020) (distinguishing *Hood v. Gilster-Mary Lee Corp.*, 785 F.3d 263, 266 (8th Cir. 2015).).[18]

Under these clear guideposts, Plaintiff's Third Amended Complaint proposes a class that

---

[18] Geographical limitations also ensure that the predominance requirements of Fed. R. Civ. P. 23(b)(3) will be satisfied because the class members are not subject to various different statutory and tort schemes by virtue of their citizenship. *See, e.g., In re American Medical Systems, Inc.* 75 F.3d 1069, 1085 (6th Cir. 1996)(Finding predomination requirement unsatisfied, in part, because the proposed class was a nationwide class which would require the application of multiple state law frameworks.); *see also* Sec. II(D), *infra* (applying Fed. R. Civ. P. 23(b)(3).).

is easily ascertainable. The Plaintiff's Third Amended Complaint defines her proposed class as residents or the legal representatives of those residents of Richmond Place – the nursing home located at 2770 Palumbo Drive, Lexington, KY 40509 -  from January 1, 2014 to present who are Kentucky citizens. Third Amended Complaint, at [DN 27].[19] Plaintiff proposes a temporal narrowing of this class category to be limited to residents or the legal representatives of those residents at Richmond Place from April 1, 2014 to March 31, 2018, based on her expert reports documenting the duration of Defendants' fraud as discussed in this Motion.[20] Narrowing a class definition is acceptable at the certification stage. *Beaton v. SpeedyPC Software,* 907 F.3d 1018, 1023 (7th Cir. 2018), *cert. denied,* 139 S.Ct. 1465, 203 L. Ed. 684 (2019).

During the course of this lawsuit, Defendants have produced documents which demonstrate the ease of class ascertainability under this definition: the Detailed Census Report by Payer Code, attached hereto as Exhibit 18. At this pre-certification stage of the litigation, the Detailed Census Report contains redactions of all other resident names, however, on CJOHSNSON-D-015572, the Court can review the unredacted information related to Plaintiff. Ms. Johnson's name appears next to a nursing home-assigned ID number and her first date of residency. This nursing home-assigned ID number populates on Ms. Johnson's bills which also contain her home address and dates of residency. *See* Carrie Johnson Bill for Services, attached hereto as Exhibit 19. The unredacted Detailed Census Report will therefore identify the potential class members.

By cross-referencing their names with Richmond Place bills from the same time period, a

---

[19] Plaintiff propounded a Request for Production for complete information regarding the last known names and addresses of these residents in her First Set of Requests for Production of Documents; Defendants objected, and Plaintiff filed a Motion to Compel. The Motion was denied by the honorable presiding Magistrate Judge pre-certification. [DN 219].

[20] Plaintiff has asked for the following class definition in her proposed Order tendered herein: "Residents of Brookdale Richmond Place – the Skilled Nursing Facility located at 2770 Palumbo Drive, Lexington, KY 40509 - and/or their representatives who resided at Richmond Place for any length of time from April 1, 2014 to March 31, 2018 who are also Kentucky citizens."

class roster and last known address can be easily ascertained. Citizenship can either be inferred from payor source – as discussed in Sec. (II(c)(1) *infra* regarding the numerosity requirement – gleaned from the location of the address whether in Kentucky or out-of-state, or affidavits can be sent to last known addresses to ascertain the objective fact of state citizenship. *See Sharrieff v. Huntington Bank*, No. 11-2340-STA-TMP, 2012 WL 3253160, at *2 (W.D. Tenn. Aug. 7, 2012) (Determining citizenship of individuals) (noting that to determine citizenship, "[t]he relevant address for an individual is his home address."); *See also Littler,* 2020 WL 1861646, at *14 (noting state citizenship for class certification is "simple and objective information."); *see also In re Dial,* 312 F.R.D. at 36 (approving of affidavits as a mechanism to ascertain the members of the class and noting that "requiring that plaintiffs conjure up all the ways that they might find the evidence sufficient to approve someone as a class member" is "putting the cart before the horse."). This process is by no means too administratively difficult to execute; in fact, if a class were certified, the same ascertainment of last known addresses and mailing procedure would likely need to be undertaken under Rule 23(c)(2)(b) to provide the class members notice of this lawsuit.[21] Defendants' data is therefore more ascertainable and feasible than the defendants' data in *Young*; no outside geocoding software will be necessary to determine class membership, many of the steps necessary to determine class membership are necessary to provide notice to potential class members, and Defendants have easy access to information necessary to determine class membership.

Ms. Johnson also satisfies the second prong of the threshold inquiry: she is a member of

---

[21] This procedure presupposes that Defendants do not have access to names and addresses in a readily accessible electronic format; they do. During her deposition, former Director of Nursing Amanda Mather testified that the facility used an electronic program named PointClickCare to track the provision of services. Deposition of Amanda Mather, Exhibit 9, p. 50, ll. 13-16. This program allows a user to run a census showing each person in the building for a historical time period, payor sources, and resident demographic information including address. *PCC List of Reports*, attached hereto as Exhibit 21.

the class she seeks to represent. As demonstrated by CJOHSNSON-D-015572, Ms. Johnson was a resident of Brookdale Richmond Place during the time period covered in Plaintiff's class definition. Furthermore, she is a citizen of the Commonwealth of Kentuckyand has lived at the same address in Lexington, Kentucky for ten years.[22] Ms. Johnson therefore is a Kentucky citizen who sought care at Richmond Place between April 1, 2014-March 31, 2018. Based under these facts and applicable law, all threshold requirements to class certification are satisfied.

### C. The Requirements of Rule 23(a) are satisfied.

After the Court has engaged in a threshold inquiry to determine whether there is a class and whether Plaintiff is a part of it, Courts in this circuit next turn to whether the Plaintiff has satisfied Rule 23(a). The proposed class at bar satisfies this rule in all pertinent respects due to the sheer number of potential class members, the facts and law common to the class inherent in Defendants' false CMS-671 Forms, and the uniformity between the class claims and Ms. Johnson's claims.

1. Joinder is impracticable pursuant to Rule 23(a)(1) because the class consists of 884-3102 members.

"A proposed class meets the numerosity requirement by demonstrating the impracticability, not the impossibility, of joinder." *Brashear v. Perry County, KY¸*2007 WL 1434878, CI No. 6:06-143-DCR (E.D. Ky. May 14, 2007) (internal citations omitted). In order to satisfy this inquiry, the Plaintiff must "sufficiently demonstrat[e] the existence of the number of persons they purport to represent." *Id.* There is no bright-line numerical test for numerosity. "Instead, the appropriate inquiry is whether the plaintiff has sufficiently demonstrated the existence of the numbers of persons he purports to represent," based on reasonable inferences

---

[22] Plaintiff's Answers to Interrogatories Excerpt, attached hereto as Exhibit 21.

drawn on the facts before it. *Napier v. Laurel County, Ky.*, 2008 WL 544468, CI NO. 6:06-368-DCR, *10 (E.D. Ky. 2008) (internal citations omitted.). While no specific number is required, the sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Powell v. Tosh*, 280 F.R.D. 296, 303 (W.D. Ky. 2012), on reconsideration, No. 5:09-CV-121, 2012 WL 2601946 (W.D. Ky. July 5, 2012). Consequently, Courts in the Sixth Circuit have concluded that putative class sizes of 100 potential plaintiffs are large enough so that their size, standing alone, makes joinder impracticable even if the class members are located in the same area. *Iron Workers Local Union No. 17 Ins. Fund & its Trustees v. Philip Morris Inc.,* 182 F.R.D. 523, 531 (N.D. Ohio 1998) (class of 100 fulfills numerosity requirement.); ("[J]oining approximately 100 nonparties, despite all being located in Ohio, would be difficult and inconvenient.") (collecting similar cases of 50 and 55 plaintiffs.).

In addition to a numerical analysis, the Court may consider other factors including the "(1) judicial economy arising from the avoidance of a multiplicity of actions; 2) the geographic dispersion of class members; 3) the financial resources of class members; 4) the ability of claimants to institute individual lawsuits; 5) the amount of each member's individual claim; 6) knowledge of the names and existence of the potential class members; and 7) whether potential class members have already joined other actions." *Tosh,* 280 F.R.D. at 303.

Just like class damages can be calculated from Defendants' attested Cost Reports, so too can the size of the class. Richmond Place's Cost Reports reveal that 3102 people became residents of the nursing home between 2014-2018 with approximately 100% turnover.[23] Plaintiff submits that for some of these individuals, their Kentucky citizenship will be the subject of post-

---

[23] Specifically, these numbers Richmond Place's Cost Reports show 730, 744, 786, 514, and 328 admissions in 2014, 2015, 2016, 2017 and 2018, respectively. Richmond Place Cost Reports, Exhibits 11-15, at (7) respectively. At the same time, Richmond Place's discharge data indicates that it discharged 766, 864, 787, 492, and 337 people each respective year, meaning that Richmond Place's year-on-year turnover was nearly 100%. *Id.*

certification administration. However, Defendants' own data again confirms that many of these individuals are also citizens of Kentucky, and thus, Plaintiff can demonstrate the existence of class members sufficient to certify the class. *Napier*, 2008 WL 544468 at *10. Richmond Place has produced documentation of the payor sources for its residents during 2014-2018. For the years 2014-2018, Richmond Place drew 261 residents from state Medicaid payor sources.[24] Medicaid is a state-run program that is only available to Kentucky residents and is therefore a proxy to determine citizenship.[25]

Additionally, Richmond Place also served a number of individuals through the Kentucky Healthcare Exchange and other managed care organizations, like those individuals covered by Anthem BCBS. These programs, likewise, have geographical in-network requirements providing for nursing home care within thirty (30) miles of an individuals' home address.[26] Plaintiff respectfully requests that the Court take judicial notice of the fact that one cannot cross into another state by driving 30 miles from Richmond Place in any direction. Thus, residents who made use of this payment method likely had home addresses within the state of Kentucky. For the years 2014-2018, Richmond Place drew approximately 623 of its residents from these managed care payor sources.[27] Combined with its Medicaid population, then, 884 people in the proposed class used services to pay for care that indicate they were Kentucky citizens. Upon information and belief, Plaintiff submits that post-class certification administration will reveal that a majority of residents who paid for care in other ways were also citizens of Kentucky because the nature of nursing home

---

[24] Richmond Place claimed Medicaid residents in the following increments per year: 6.4%, 8.0%, 8.5%, 11.0%, and 9.2%. Richmond Place 12 Month Budget Trends, Exhibit 22, at 1, 5, 9, 13, and 17. As applied to each class year, then, and with year-on-year turnover of approximately 100%, Richmond Place's Medicaid population was 261 people.

[25] KMP Program Requirements, attached hereto as Exhibit 23.

[26] Anthem BCBS in-network geographical requirements, attached hereto as Exhibit 24.

[27] Richmond Place claimed residents from managed care payor sources in the following increments per year: 19.5%, 20.1%, 22.3%, 16.0%, and 14.5%. Richmond Place 12 Month Budget Trends, Exhibit 22, at 1, 5, 9, 13, and 17. As applied to each class year, then, and with year-on-year turnover of approximately 100%, Richmond Place's Managed Care Organization population was 623 people.

care encourages people to stay close to their communities and family. Plaintiff only undertakes the foregoing analysis to show that she can identify a significant number of class members pre-certification such that the number of these class members, standing alone, warrant certification. *Tosh*, 280 F.R.D. at 303 ("…more than several hundred" class members "can be the only factor needed to satisfy Rule 23(a)(1).").

The remaining factors identified by the Court in *Tosh* also strike in favor of class certification. First, judicial economy undoubtedly will be served in consolidating the putative class members' 3000 possible actions into one single action because 3000 different judges will not have to hear 3000 different claims. *Tosh*, 280 F.R.D. at 303 (*first factor*). Second, the size of the claims and the financial resources necessary to bring those claims favor class action treatment. Defendants' Federal Cost Reports state that the average length of resident stay in Defendants' facility ranged from 40.80 days to 92.56 days from 2014 -2018.[28] Using the damages model proposed by Plaintiff's Expert, Valerie Gray, and approved by her Administrator and Nursing experts, the averages damages award per putative class member -exclusive of punitive damages – would be approximately $585.00 to $2,613.00. It would thus be difficult for each of these individual class members to find counsel, seek out the court system, obtain documents and depositions that are necessary in support of their claim, and obtain expert proof *which has already been obtained in this lawsuit* such that these claims make financial sense to bring separately. *Id. (third through fifth factor).* Furthermore, while the class members will be readily ascertainable after the class is certified, they are not currently ascertainable to Plaintiff or the public at large, nor have any of them, to the undersigned counsel's knowledge, filed a lawsuit addressing these claims. *Id.* (*sixth and seventh factors*). For these reasons, then Plaintiff's putative class is sufficiently

---

[28] Richmond Place Cost Reports, Exhibit 11-15, at (7), respectively.

numerous to warrant class treatment under Rule 23(a)(1).

    2.   The Commonality Requirement of Rule 23(a)(2) is satisfied because all claims turn on Defendants' submission of false staffing data on CMS-671 Forms.

The Commonality requirement of Rule 23(a)(2) "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Rikos*, 799 F.3d at 506. This requirement is "generally satisfied where there is a single issue common to all members of the class" which will "advance the litigation." *Tosh*, 280 F.R.D. at 305; *see also Sprague,* 133 F.3d at 397 (requiring only one common question to certify a class.). Furthermore, Courts do not decide the resolution of common questions at the certification stage; instead the Court simply inquires as to whether such common questions exist. *Grubb v. Marcum*, 2006 WL 625148, No. Civ.A. 6:05-498-DCR at *3 (E.D. Ky. March 9, 2006) (conducting same analysis.). In *Wal-Mart Stores, Inc. v. Dukes*, the United States Supreme Court explained that a common question:

> [m]ust be of such a nature that it is capable of class-wide resolution – which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

- U.S. -, 131 S.Ct. 2541, 2551, 180 L.Ed. 2d 374 (2011). The Commonality requirement is often satisfied when "the defendants are alleged to have directed standardized conduct toward the putative class members, or where the class claims arise out of standard documents." *Chisolm v. TranSouth Financial Corp.* 194 F.R.D. 538, 554 (E.D. Va. 2000) (quoting *Peterson v. H&R Block Tax Servs. Inc.*, 174 F.R.D. 78 (N.D. Ill. 1997).

A Court may analyze the existence of common questions by referencing the elements of the Class Complaint as pled. *See, e.g., In re Whirlpool Corp. Front-Loading Washer Products Liabiltiy*, 722 F.3d 838, 853 (6th Cir. 2013) (discussing elements of claim in light of common question.). A litigant also may satisfy the commonality of proposed common questions by referencing her expert's report. *Tosh*, 280 F.R.D. at 306. In the case at bar, Plaintiff has pled class

claims sounding in Kentucky law for violations of the Kentucky Consumer Protection Act (Count XVII), Unjust Enrichment (Count XVI), and Fraud claims sounding in Fraud in the Inducement (Count IX), Fraudulent Misrepresentation, Fraudulent Concealment, and Fraudulent Nondisclosure (Count X). The class' causes of action for all of these counts rest on the same course of standardized conduct involving standardized documents: Defendants inflated the data contained on the CMS-671 Forms thereby obtaining a higher star rating, as mathematically demonstrated by Defendants' expert disclosures and discussed in the factual section of this Memorandum. The common questions of fact and law implicated by this course of conduct are as follows:

1.  Whether Defendants' CMS-617 Forms and star ratings are inaccurate and contain false data; (Count XVII, XVI, IX, and X)
2.  Whether the false data on Defendants' CMS-671 Forms and star ratings constitute an "unfair, false, misleading, or deceptive act or practice" under the Kentucky Consumer Protection Act, KRS 367.170; (Count XVII)
3.  Whether Defendants' false CMS-671 Forms and star ratings conferred an inequitable benefit upon Defendants at Plaintiffs' expense; (Count XVI)
4.  Whether Defendants were unjustly enriched; (Count XVI)
5.  Whether the false CMS-671 Forms and star ratings are material misrepresentations; (Count IX and X)
6.  Whether Defendants placed false data on the CMS-671 forms intentionally and/or recklessly; (Count IX and X)
7.  Whether Defendants intended the false staffing information to induce potential residents to become residents of Richmond Place; (Count IX and X)
8.  Whether Plaintiff and the putative class relied upon the false, inflated star ratings;[29] (Count IX and X)
9.  Whether Plaintiff and the putative class made payments to Richmond Place; (Count XVII, XVI, IX, and X)
10. Whether Plaintiff and the putative class were damaged as a result of these actions; (Count XVII, XVI, IX, and X)
11. Whether Defendants Benita Dickenson and Ann Phillips were acting within the scope and course of their employment and/or Defendants otherwise ratified their conduct; (Count XVII, XVI, IX, and X)
12. Whether Defendants were acting in a joint venture such that all Defendants are liable to Plaintiffs; (Count XVII, XVI, IX, and X)
13. Whether punitive damages should lie against Defendants. (Count XVII, XVI, IX, and X).

---

[29] See Sec. II(D), infra regarding the susceptibility of reliance to class-wide proof.

All of these questions of fact and law turn on standards susceptible to class resolution because they either involve the state of mind of Defendants which will be applicable to all class members (i.e., the intent of Defendants in posting false staffing data) or they are decided by objective standards (i.e., payments to Defendants, materiality and unfair, misleading, or deceptive acts or practices.) *Sparks v. Re/Max Allstar Realty, Inc.,* 55 S.W.3d 343, 348 (Ky. Ct. App. 2000) (Applying objective standard to definition of "unfair, misleading, or deceptive acts or practices."); *see, e.g., Smith v. Gen. Motors Corp.,* 979 S.W.2d 127, 129 (Ky. Ct. App. 1998) (Defining materiality for fraud claims as "material to a reasonable person."). This is especially true for Plaintiff's Kentucky Consumer Protection Act and Unjust Enrichment claim. These claims do not require reliance or a culpable state of mind on the part of the plaintiff or class members as an element of the claim and can therefore be adjudicated according to the class-wide actions of Defendants in documenting and publishing false staffing data. *Telcom Directories, Inc. v. Com. ex rel Cowan*, 833 S.W.2d 848, 850 (Ky. Ct. App. 1991) (Rejecting reliance requirement under KCPA); *Brown v. Tax Ease Lien Servicing, LLC*, No. 3:15-CV-00208-CRS, 2015 WL 7431044, at *11 (W.D. Ky. Nov. 20, 2015) ("Reliance is not a required element of a claim under the KCPA nor is a fraudulent practice."). Once a jury concludes that Defendants' data was untrue and whether that manipulation was unfair, false, misleading, deceptive, reckless, intentional, or material, then Defendants will be liable to the class members for the staffing levels they did not receive but should have received as advertised. *See, e.g., Beattie v. Century Tel, Inc.,* 511 F.3d 554, 566 (6th Cir. 2007) (Discussing the intersection of materiality and consumer protection in class action phone cramming case and noting harm is established once materiality and purchase is proved.).

Additionally, the lack of a reliance requirement in the KCPA demonstrates that the statute is remedial, designed to protect consumers, and attuned for use in class action litigation. *See, e.g,*

*Alexander v. S & M Motors, Inc.,* 28 S.W.3d 303, 306 (Ky. 2000) (recognizing remedial nature of KCPA to address consumer complaints of small monetary value that would not otherwise have a remedy at law.). Courts in this and other Circuits "*routinely find commonality in false advertising cases.*" *Rikos*, 799 F.3d at 507 (emphasis in original) (internal citations omitted) (collecting cases). Indeed, the Court in *Rikos* indicated that commonality was so routine in false advertising cases that the non-movant had "failed to identify a single false-advertising case where a federal court had denied class certification because of a lack of commonality." *Id.* Based on the foregoing case law, the question of whether Richmond Place falsified its CMS-671 Forms and thereby obtained a false star rating – and all the common questions predicated upon the resolution of this overarching question – are designed for class resolution under the requirements set forth in *Dukes* and its progeny.

### 3.   The Typicality Requirement of Rule 23(a)(3) is satisfied.

The Typicality requirement of Rule 23(a)(3) requires the plaintiff to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Rikos*, 799 F.3d at 509.  This analysis "often tend[s] to merge" with the Commonality requirement. *Id*. The typicality requirement does not require the class representatives' claims to exactly mirror the claims of all other class members, and in fact, a representative's claims still may be typical "even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other class members." § 1764 *The Claims or Defenses of the Representatives Must Be Typical*, 7A Fed. Prac. & Proc. Civ. § 1764 (3d ed.). It is enough that the representative's and the class's claims "stem from a single event or a unitary course of conduct, or if they are based on the same legal theory." *Id. See also Rikos*, 799 F.3d at 509 (quoting same.). This standard is clearly satisfied in the case at bar.

The only difference between the claims of Carrie Johnson and the claims of the putative class members is that the amount – not the mechanical calculation – of damages may be different depending upon the length of the residency.[30] In all other respects, Ms. Johnson's class claims and the claims of the putative class members are identical, as all claims arise out of Defendants' course of conduct in falsifying their CMS-671 Forms in order to obtain a falsified, inflated star rating.

The Sixth Circuit rejected the contention that differing amounts of damages between the class members could render a class atypical or uncommon in *In re Whirlpool*, noting, "no matter how individualized the damages may be, determination of damages may be reserved for individual treatment with the question of liability tried as a class action." *Id.* (internal citations omitted); *see also Peck v. Air Evac EMS, Inc.,* 2020 WL 354307, 5:18-615-DCR, *5 (E.D. Ky. Jan. 21, 2020) (Approving class settlement under Rule 23(b)(3) where "the proposed class members' claims all share the same question of law and the only difference is the potential amount of overtime pay due to them."). For these reasons, then, Carrie Johnson's class action claims are typical of the claims of the other putative class members under Rule 23(a)(3).

### 4. The Fair and Adequate Representation Requirement of Rule 23(a)(4) is satisfied.

In this Circuit, a representative will fairly and adequately represent the class when she has "common interests with unnamed members of the class," and proposed class counsel will "vigorously prosecute the interests of the class through qualified counsel." In re Am. Med. Sys., Inc., 75 F.3d 1069, 1083 (6th Cir. 1996). The "common interests" requirement under Rule 23(a)(4)

---

[30] Plaintiff notes that the Third Amended Complaint contains several single-event allegations that are not applicable to the class as a whole. Plaintiff has brought these claims in tandem with the class action claims to avoid even the appearance of breach of fiduciary duty that may be raised by filing two separate lawsuits. *Beverly Enterprises-Arkansas, Inc. v. Thomas,* 370 Ark. 310, 320, (Ark. 2007) (*dicta*). If the Court is concerned about these individual claims, Plaintiff respectfully requests that the Court bifurcate the single event claims from the class action claims and hold them in abeyance until after the class action claims are resolved. *Chisholm,* 194 F.R.D. at 554 (separation of non-class claims).

often "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.* For the reasons stated in Sec. II(C)(3), *supra*, Carrie Johnson's class action claims are typical of all of the other class members' claims and therefore she will fairly and adequately represent the class. Furthermore, this litigation has been filed as a putative class action since the fall of 2018 during which time Ms. Johnson has served as the putative class representative. She has acquitted herself well in this role, taking part in all necessary portions of pretrial procedure. Her health is not an impediment to this action, and even though she is bed-bound, she continues to be an active participant by submitting to both Plaintiff's and Defendants' experts' in-person medical examinations and providing her deposition. She has no psychological problems that would hamper her ability to vigorously serve as class representative. *Id.* (discussing psychological problems as potential barrier for putative class representative.).[31]

Just as Ms. Johnson is an adequate class representative, the undersigned counsel and her co-counsel will vigorously advocate on behalf of each of the putative class members. Rule 23(g)(1)(A) provides the framework for evaluating the adequacy of class counsel in a Motion for Class Certification, and directs the Court to consider 1) the work counsel has done in identifying or investigating potential claims in the action; 2) the experience of counsel in handling class actions, other complex litigation, and the types of claims asserted in the action; 3) knowledge of applicable law; and 4) the resources counsel will commit to representing the class. *See also IUE-*

---

[31] As discussed in n. 29, Ms. Johnson has also pled a number of bodily injury claims in the context of her Third Amended Complaint. These claims are not conflicted or opposed with the claims pled on behalf of the putative class; in fact, if the putative class claims are successful then Ms. Johnson's bodily injury claims will likewise be successful because she has pled she suffered bodily injury as a result of understaffing. *See, e.g.,* Third Amended Complaint, [DN 27], at Count III, ¶ 121 (hiring and retention of nurses.). To the extent that the Court is concerned about Plaintiff's single event causes of action, Plaintiff respectfully requests that the Court bifurcate these single event and class event causes of action.

*CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 592 (E.D. Mich. 2006) (applying Rule 23(g)(1)(A) to class certification motion.). Plaintiff proposes the following class counsel structure for the certified class: Laraclay Parker as Lead Counsel and J. Dale Golden as Co-Lead Counsel. Plaintiff attaches hereto resumes of both attorneys outlining their relevant work experiences as Exhibit 25.[32] Both attorneys are experienced in nursing home litigation involving claims of understaffing and multi-plaintiff complex litigations including class action and MDL work. This depth of experience will benefit the class.

As demonstrated by the Affidavit of Ms. Parker attached hereto as Exhibit 26, the firm of Golden Law Office stands ready to commit resources to representing the class, just as it has done to obtaining expert disclosures of staffing and damages analyses on behalf of the class pre-certification. In addition to the co-leads, Golden Law Office has a team of additional attorneys and paralegals who will provide services to serve the potential class members, including Justin S. Peterson, an additional partner at the Golden Law Office, who has been involved in this litigation since its inception.[33] Based on the foregoing, then, Ms. Johnson is qualified to represent the class and proposed class counsel fulfill all the requirements of Rule 23(a)(4). *See also Brashear,* 2007 WL 1434876, at *7  (Indicating extensive experience in an area of law and class experience may be enough to satisfy counsel requirements, but declining to certify class based on failure of

---

[32] Briefly, Ms. Parker is a Partner at the Golden Law Office who is responsible for the firm's nursing home, medical malpractice, and complex litigation cases wherein she litigates in several multi-district litigations and serves as Liaison Counsel in MDL 2809 Onglyza (Saxagliptin) and Kombiglyze XR (Saxagliptin and Metformin) Products Liability Litigation. Ms. Parker has been involved in this matter since its inception, obtaining and reviewing thousands of records through open records requests and publicly available staffing data. She has been the taking attorney on every deposition in this matter and is very familiar with the law applicable to staffing in the skilled nursing context. Mr. Golden is a Senior Partner at Golden Law Office and is first chair on many of the firm's trial cases. His thirty-year legal career involves numerous class action lawsuits, multi-million-dollar jury verdicts, and critical appellate work, as well as representing clients subjected to neglect, abuse, and understaffing in nursing homes. He will assist Ms. Parker with all aspects of discovery, federal rule compliance and trial preparation.

[33] One of the attorneys who will assist lead counsel on this case, Drew Byron Meadows, served on the defense class counsel team in *Powell v. Tosh* cited extensively herein.

common interest.). Plaintiff's claims therefore fulfill all prerequisites to certification contained in Rule 23(a).

### D.  **The proposed class qualifies for class treatment under Rule 23(b)(3).**

Once a movant demonstrates that a proposed class qualifies for class treatment under Rule 23(a), the movant must then show that the class "pass[es] at least one of the tests set forth in Rule 23(b). *Sprague,* 133 F.3d at 397. This case qualifies for class treatment pursuant to Fed. R. Civ. P. 23(b)(3), which allows a class to be certified if "the Court finds that the questions of law or fact common to the class members predominate over questions affecting over individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." This inquiry is generally split into two requirements: the predominance requirement and the superiority requirement. Both requirements are satisfied because Plaintiffs' claims turn on Defendants' submission of false staffing data in the same collection of documents and class action procedures will conserve judicial resources which would otherwise be spent on litigating 3000 individual suits.

The predominance requirement of Rule 23(b)(3) will be satisfied "when the legal or factual questions in a case are subject to generalized proof, and thus applicable to a class as a whole." *Peck,* 2020 WL 354307, at *5. As framed by the Supreme Court in *Dukes,* "[w]hat matters to class certification is not the raising of common questions – even in droves – but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." 131 S.Ct. at 2551. The Supreme Court has also emphasized that "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen, Inc. v. Conn Ret. Plans & Tr. Funds, -* U.S. -, 133 S.Ct. 1184, 1191 (2013). Other Circuits have noted that Rule 23(b)(3) is intended to be applied less stringently

than Rule 23(b)(1) or (2), and that its core purpose is to "vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation," like the claims presented in this case. *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 41 (1st Cir. 2003); *see also In re American Medical Systems, Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996) (recognizing Rule 23(b)(3) "as a means for assuring legal assistance in the vindication of small claims" as well as mass torts.) (internal citations omitted.).

While Plaintiff has been unable to locate a nursing home understaffing case in this particular jurisdiction, other jurisdictions applying similar causes of action to nursing home understaffing claims have found that the question of whether a nursing home was, in fact, understaffed, predominates over all other questions. For example, in *Robinson Nursing and Rehabilitation Center, LLC v. Phillips*, the plaintiff brought a putative class action alleging that the defendants chronically understaffed their nursing facility and claimed bodily injury damages, economic damages under the the Arkansas Deceptive Trade Practices Act [ADTPA], unjust enrichment, violations of various resident's rights statutes, state law, and the admissions agreement. 519 S.W.3d 291 (Ark. 2017). The Court below certified the class on twelve different questions separated by the plaintiff's claims under the ADTPA, statutes, and common law. *Id.*[34] The nursing home appealed this certification to the Supreme Court of Arkansas partly on predominance grounds. Quoting favorably from *Beverly Enterprises – Arkansas, Inc. v. Thomas*, a prior opinion certifying a class for nursing home understaffing, the Court found that understaffing class actions turn on one preliminary fact – whether understaffing actually occurred:

"We conclude **that one main and preliminary overarching issue**

---

[34] There was no evidence in *Robinson* that the nursing home had falsified documents to federal or state inspectors; merely that their chronic – though honest – understaffing constituted deceptive trade practices because the nursing home could not provide the care it promised. *Id.* The case before this Court concerns facts of a more serious mien involving fraudulent, rather than merely negligent, staffing. However, the proposed common questions in both litigations are similar.

> **does exist in this case, which is whether the Batesville nursing
> facility was chronically understaffed so as to violate the
> residents' statutory and contractual rights**….we hold that the
> circuit court did not abuse its discretion in determining that the
> overarching issue of understaffing is common to the class and may
> be resolved before individual issues of damages must be addressed."
> *Beverly Enterprises – Arkansas Inc. v. Thomas*, 259 S.W.3d 445,
> 450 (Ark. 2007)
>
> Thus, in holding that the circuit court did not abuse its discretion in finding that the
> element of predominance had been satisfied, the court explained that "the common,
> overarching issues concern whether appellants have liability for chronic
> understaffing under the admission agreement and the asserted statutes." 465
> S.W.3d at 835. Accordingly, based on [the above-cited case], as to the breach of
> contract, **ADTPA, and unjust-enrichment claims**, we hold that the circuit court
> correctly found that the….predominance requirement of Rule 23 had been met.

*Id.* at 298-99; *see also GGNSC Arkadelphia, LLC v. Lamb by and through Williams*, 2015 Ark.

253 (Ark. 2015) (upholding class certification for nursing home understaffing claims based on

same language.) (emphasis added).

Just like in *Robinson,* class claims arising out of a nursing home's failure to staff are subject

to class treatment because the question of whether the nursing home actually failed to staff

consistent with its representations predominates over every other legal and factual issue. And just

like in *Robinson*, this conclusion is especially true for KCPA and unjust enrichment claims because

neither claim requires individualized proof of the state of mind of the putative class plaintiff, but

rather, is susceptible to objective facts that can be decided on a class basis. *See* Sec. II(C)(2), *supra*

*discussing Kentucky law.)* Furthermore, any differences in damages between class members may

be handled after the liability phase of this case has concluded through the use of a class-wide

damages formula proposed by Plaintiff's experts. *Beattie,* 511 F.3d at 559 (approving of class

certification premised on misleading telephone billing practices as to liability – predicated on

purchase of phone services – and providing for separate, individualized damages analysis.). This

same conclusion applies to Plaintiff's and the putative class members' claims sounding in fraud;

just like her KCPA and unjust enrichment claims, all elements of Plaintiffs' fraud claims are subject to class-wide proof. *See, e.g.* Sec. II(C)(2), *supra* (discussing state of mind of Defendants.). Reliance may be the subject of class-wide proof when consumers have the same reason to access the product. Thus, in *Rikos*, the Sixth Circuit approved of class-wide reliance proof because "there is only one reason to buy [the probiotic] *Align*, to promote digestive health," and Plaintiff alleged that this very claim was false. 799 F.3d at 517; 5. Just like the consumers in *Rikos*, there is only one reason to become a resident of a skilled nursing facility: *to obtain skilled nursing care*.[35] Just like *Rikos*, Plaintiff claims that this skilled nursing care was falsely advertised. Thus, for all three main theories of recovery pled in Plaintiff's class action complaint, the key legal and factual issues may be the subject of class-wide proof and individual issues will not predominate.

Finally, the superiority requirement of Rule 23(b)(3) is clearly satisfied in this case. The class format will protect the Defendants from inconsistent judgments and allow class members to pool their resources in order to obtain recovery for litigants who "may not receive a significant payout making it burdensome to pursue litigation on their own." *Peck*, 2020 WL 354307, at *4. To the undersigned's knowledge, no other putative class member has filed litigation seeking to recover for this class-wide harm. *Id.*; *see also Robinson*, 2017 Ark. 519 S.W.3d at 299 (discussing state superiority requirement in nursing home understaffing class action, and finding class action format the most efficient format for resolution of claims.). This conclusion is not disturbed by the administrative possibility of subclasses or bifurcation of the liability and damages phase of the class. *Beattie*, 511 F.3d at 566-67. For these reasons, then, the proposed class action fulfills all

---

[35] In fact, the payor sources used to pay for care at Richmond Place specifically require a physician to certify this reason for seeking care. *See* Medicare Learning Network Skilled Nursing Facility Certifications and Recertifications, attached hereto as Exhibit 27, p 2 (noting that in order for Medicare claims to be paid a physician must certify that "the individual needs skilled nursing care (furnished directly by or requiring the supervision of skilled nursing personnel) or other skilled rehabilitation services, on a daily basis, that "can only practically be provided in an SNF.").

requirements of both Rule 23(a) and 23(b)(3). Plaintiff therefore respectfully requests that this Court enter an Order certifying the class and appointing class counsel as described *supra.*

### E.  Conclusion

The overarching issue of whether Defendants falsified their staffing data on CMS-671 Forms, therefore misleading, defrauding, and otherwise misrepresenting the services purchased by Richmond Place residents is amenable to class resolution. The class action format contemplated by Rule 23 will serve the twin aims of vindication of a number of small claims that would not otherwise be addressed by the justice system and the conservation of judicial resources. For these reasons, Plaintiff respectfully requests that this honorable Court certify a class and appoint class counsel as requested herein.

Respectfully submitted,
GOLDEN LAW OFFICE, PLLC
*/s/ Laraclay Parker*
Laraclay Parker
J. Dale Golden
Justin S. Peterson
771 Corporate Drive, Suite 800
Lexington, Kentucky 40503
Telephone:    (859) 469-5000
Facsimile:    (859) 469-5001
lparker@goldenlawoffice.com
dgolden@goldenlawoffice.com
jpeterson@goldenlawoffice.com
COUNSEL FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2020, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice to the following:
Donald L. Miller, II, dmiller@qpwbaw.com
J. Peter Cassidy, III, pcassidy@qpwblaw.com
Quintairos, Prieto, Wood & Boyer, P.A.
2452 Sir Barton Way, Suite 300
Lexington, KY 40509
*Counsel for Defendants*

*/s/ Laraclay Parker*
COUNSEL FOR PLAINTIFFS